UNITED STATES of America, Appellee,

v.

Everett CARLSON, Defendant, Appellant.

No. 76–1515.

United States Court of Appeals,
First Circuit.

Argued March 2, 1977.

Decided Sept. 13, 1977.

Theodore K. Hoch, by appointment of the Court, with whom Fitzgerald, Donovan, Conley & Day, Bath, Me., was on brief, for appellant.

Rufus E. Stetson, Jr., Asst. U.S. Atty., with whom Peter Mills, U.S. Atty., Portland, Me., was on brief, for appellee.

Before COFFIN, Chief Judge, MOORE, Circuit Judge,* and CAMPBELL, Circuit Judge.

* Of the Second Circuit, sitting by designation.

LEVIN H. CAMPBELL, Circuit Judge.

Everett C. Carlson and three others were charged in count one of a three-count indictment as follows:

"That on or about July 1, 1976, in the Southern Division of the District of Maine, EVERETT C. CARLSON, JOSEPH A. ACETO, RICHARD J. PICARIELLO and EDWARD P. GULLION, JR., did transport in interstate commerce, from Portland, Maine, to the District of Massachusetts, explosives, that is, about 75 sticks of dynamite, blasting caps, and timing devices for bombs, with knowledge and intent that the same be used to intimidate individuals, and to unlawfully damage and destroy buildings, vehicles and other real and personal property, that is, a National Guard truck at the National Guard Armory, Dorchester, Massachusetts, an airliner at Logan Airport, Boston, Massachusetts, and the Essex County Courthouse, Newburyport, Massachusetts, in violation of Title 18, United States Code, Sections 844(d) and 2."

Section 844(d) of Title 18 makes it a crime for one to transport "in interstate or foreign commerce any explosive with the knowledge or intent that it will be used to kill, injure or intimidate any individual or unlawfully to damage or destroy any building, vehicle or other real or personal property . . . ." Carlson was tried separately from his three codefendants. At the close of the Government's case, he moved for a judgment of acquittal, in part on the ground that the Government failed to prove that at the time of the interstate transportation he had an intent to bomb the three targets named in the indictment. The district court denied the motion. The defense then rested and renewed the motion, which was again denied.

The district court charged the jury on the element of intent as follows:

"With respect to the second element, that is, the element of intent, I instruct you that in order to convict Mr. Carlson, you must be satisfied, beyond a reasonable doubt, that at the time of the transportation from Maine to Massachusetts, he knew and intended that the explosives, that is, the dynamite, blasting caps and timing devices for bombs, were to be used to intimidate individuals and to unlawfully damage and destroy buildings, vehicles and other real and personal property, and in this connection, I further instruct you that before you can convict Mr. Carlson, you must be satisfied that when he left Maine and when he arrived in Massachusetts, that is, while he was transporting the explosives from Maine to Massachusetts, he knew and intended at that time that the explosives were to be used to unlawfully damage and destroy the National Guard truck at the National Guard Armory in Dorchester, an airliner at the Logan Airport in Boston and Essex County Court House in Newburyport."

After the jury returned a verdict of guilty, defendant filed motions for judgment of acquittal and for a new trial, again raising the question whether there was sufficient evidence of intent to support his conviction. The district court denied the motions. Carlson appeals from the denial of these motions and from the judgment of conviction.

The case against Carlson rested in large part on the testimony of codefendant Aceto.[1] He testified to meeting with Carlson and codefendants Picariello and Gullion in early June of 1976 in Portland, Maine "to discuss strategy on a number of planned bombings that we had in mind for the upcoming Fourth of July week." The four belonged to the Fred Hampton Unit of the People's Forces; the planned bombings were to serve political ends. At a meeting in the last week of June, the four agreed that the bombings would take place and devised a list of some ten targets. By the early afternoon of July 1, the four were still uncertain as to precisely which of the ten

---

1. Testimony of several government agents established that Carlson was in frequent contact with his three codefendants during the ten days preceding the bombings on July 1 and 2, and confirmed significant parts of Aceto's testimony.

targets would be bombed, but later that day, Aceto, Gullion, and Carlson purchased final necessary supplies for three bombs, which Aceto had already partially assembled. All four codefendants participated in finishing construction of the three bombs which consisted of from 20 to 25 sticks of dynamite taped together and equipped with a blasting cap wired to a battery and a pocket watch as a timer. Also purchased that afternoon was a pair of bolt cutters which Aceto testified "were to be used to cut through a metal cyclone fence later in the evening . . . at either one of the two Armories in the state of Massachusetts."

Carrying the three completed bombs, the bolt cutters and personal firearms in their car, the four left Portland in the early evening headed for Massachusetts. Aceto testified that they "had a list of primary targets, but . . . didn't have the exact locations that [they] planned to use the bombs." The four "would drive down to Massachusetts and on the way down . . . would decide" on the specific targets for that evening's mission. A government exhibit in Picariello's handwriting lists the ten primary targets: two armories in Massachusetts, the one actually bombed in Dorchester and another in Danvers; two courthouses in Massachusetts, the Essex County Courthouse bombed later that evening and the Superior [sic] courthouse in Dorchester; an airplane at Logan Airport, also later bombed; an oil tanker in South Boston; two office buildings in Massachusetts; the federal building in Portsmouth, New Hampshire; and a submarine at the shipyard in Kittery, Maine. According to Aceto, Carlson participated in the "general discussion" of the planned targets and in "the final agreement in Massachusetts" as to which would be bombed. Another installation not on the list was also regarded as a primary target, but Aceto testified that neither it nor the submarine were being considered for the night of July 1; these two targets were to be "moved on" later the same weekend. The other installations named were prospective targets that evening.

The quartet first stopped at the federal building in Portsmouth, New Hampshire. Aceto testified that Picariello cased the building and concluded that they could not get close enough to set off a device. Aceto's testimony indicates that as of this point, he and the others "still weren't sure what we were going to use as targets". With Carlson at the wheel, the group then drove to Woburn, Massachusetts, a suburb north of Boston. Picariello and Gullion got out to look at the district courthouse. Picariello, Aceto said, decided against bombing this courthouse since it did not house a Superior Court—he was interested in bombing a court "that mainly sentenced people to prison." After stopping at a nearby gas station and filling two one-gallon containers with gas to be used in conjunction with the bombs, the group proceeded to Gullion's residence in Dorchester. At this point, Aceto and Picariello became involved in an argument over the waste of time involved in going to Woburn. The argument was not resolved, but the two "decided to quiet down and continue on our work, what we had planned for the night". The group proceeded to what is characterized as the Superior Courthouse in Dorchester, decided not to bomb it because of the presence of people, and then went to the next closest target, the Dorchester National Guard Armory, which had been "checked out" earlier in the week by Picariello and Gullion.

After fifteen or twenty minutes of checking the spot, the four cut through the armory's cyclone fence, placed one explosive on top of the diesel tanks of an army truck, set the timer for a twenty-minute delay, and evacuated the area. The went next to the terminal and hangar area of Eastern Airlines at Logan Airport. Earlier in the week, Picariello and Gullion had discovered that one of Eastern's planes in the area was vulnerable because of a break in the surrounding fence. While Carlson and Gullion covered the area, Picariello and Aceto went up the plane and placed one of the explosive devices on a wheel, set the timer and ran back. From the airport, the group proceeded northeast to the courthouse in Newbury-

port, Massachusetts which had been cased previously. They broke into the building, dumped files and court records on the floor, placed their last explosive on the pile, set the timer and left. The four then drove back to Portland, arriving at about 4 a.m. The bombs went off as planned causing extensive damage.

On appeal, Carlson argues that his conviction cannot stand as there was insufficient evidence to establish that when he left Maine and entered Massachusetts he intended to use the explosives against the National Guard Truck at the armory in Dorchester, the airliner at Logan Airport, and the Essex County Courthouse. While there was evidence from which the jury could infer, at such times, an intent unlawfully to damage and destroy property, he says the Government needed to establish his specific intent to bomb the exact three targets named in the indictment. Carlson points to the district court's charge as adopting this narrow view.

Carlson relies on cases which assert "where words are employed in an indictment which are descriptive of the identity of that which is legally essential to the charge in the indictment, such words cannot be stricken out as surplusage." *Butler v. United States,* 20 F.2d 570, 573 (8th Cir. 1927). *See Marteney v. United States,* 216 F.2d 760 (10th Cir. 1954); *United States v. Rosenson,* 291 F.Supp. 867 (E.D.La. 1968), aff'd, 417 F.2d 629 (5th Cir. 1969), *cert. denied,* 397 U.S. 962, 90 S.Ct. 992, 25 L.Ed.2d 253 (1970). His argument seems to be that the listing of the three installations was "descriptive of the identity of that which is legally essential to the charge in the indictment", i. e. the buildings that he intended unlawfully to damage and destroy. But the cited cases hold no more than that words included in an indictment which describe a circumstance or condition which must be established for a statutory violation to exist cannot be dismissed as surplusage.

■ Stated thus, the rule is irrelevant in this case. Description of the three installations was not "descriptive of the identity of that which is legally essential to the charge". The elements of the crime charged are 1) transportation or receipt in interstate commerce of 2) any explosive 3) "with the knowledge or intent that it will be used to kill, injure, or intimidate any individual or unlawfully to damage or destroy any building, vehicle, or other real or personal property". These elements were fully covered in the indictment, and there was ample evidence that on leaving Portland on July 1 Carlson had the necessary intent unlawfully to damage or destroy property. The mentioned properties were, in fact, among the prime targets and, thereafter, were bombed, but it was not essential for them to be mentioned in the indictment nor was it essential that Carlson have them specifically in mind when he went into Massachusetts. Their inclusion in the indictment neither affected the validity of the indictment nor imposed a heavier burden of proof on the Government. *See, e. g., United States v. Vento,* 533 F.2d 838, 870–71 (3d Cir. 1976); *United States v. Greene,* 497 F.2d 1068, 1086 (7th Cir. 1974); *United States v. Archer,* 455 F.2d 193 (10th Cir. 1972); *Castle v. United States,* 287 F.2d 657, 660 (5th Cir. 1961). *Compare Beauchamp v. United States,* 154 F.2d 413, 415 (6th Cir. 1946). *See generally* 1 C. Wright, Federal Practice and Procedure § 127 (1969).

■ The district court, it is true, gave Carlson's requested instruction which seems to say that Carlson had to have harbored an intention to bomb the three targets precisely while en route from Maine to Massachusetts. The evidence fails to show that these three targets had by then been finally selected, although they were among those which the four men had in mind. The instruction was not only unnecessarily narrow for reasons just stated; it seemed to assume unnecessarily that the interstate transportation would cease the very moment the car entered Massachusetts. *Cf. Gibbons v. Ogden,* 22 U.S. (9 Wheat.) 1, 6 L.Ed. 23 (1824). But Carlson was in no way prejudiced. Under the instructions given, there is no way that the jury could have

convicted unless it believed, as was fully established by Aceto's testimony, that Carlson had transported the explosives in interstate commerce "with the knowledge or intent that [they would] be used . . . unlawfully to damage or destroy any building, vehicle or other real or personal property", 18 U.S.C. § 844(d).

This is not, moreover, a case where there is such a gulf between the instructions and the evidence that it cannot rationally be explained how the jury could have arrived at a guilty verdict consistent with the court's instructions. *See Michaud v. United States,* 350 F.2d 131 (10th Cir. 1964). The instructions could have been thought to require only that Carlson's intent to use the bombs that evening to damage or destroy property embraced, along with others the three targets later bombed. All three were on the list of ten; the jury was warranted in finding that Carlson and the others intended to use the bombs on some of the ten targets on the list. The jury could have believed that the instructions did not require anything more. *See generally Kotteakos v. United States,* 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946).

After briefing and argument of this appeal by counsel Carlson requested and received our permission to file a brief *pro se.* In his brief, Carlson contends that his trial attorney, who has also represented him on appeal, was incompetent and that he was denied effective assistance of counsel.

Insofar as Carlson's claim of ineffective assistance relates to appellate assistance, we reject it. The quality both of written and oral argument has been high. On this record we are unable to see what additional issues could have been conscientiously raised by counsel.

Insofar as Carlson's claim of ineffective assistance relates to the quality of assistance at the trial, the claim involves judgments about facts outside the record. The court below did not address these issues. An appellate court cannot pass upon such matters initially. *See Sunal v. Large,* 332 U.S. 174, 177, 67 S.Ct. 1588, 91 L.Ed.

1982 (1947); *Waley v. Johnston,* 316 U.S. 101, 104, 62 S.Ct. 964, 86 L.Ed. 1302 (1942). *Cf. United States v. DeCoster,* 487 F.2d 1197, 1201 (D.C. Cir. 1973) (remanded for a supplemental hearing on counsel's preparation and investigation). Carlson will be free to file in the district court a motion under 28 U.S.C. § 2255 in which he may present that issue. *Cf. United States v. McCambridge,* 551 F.2d 865 (1st Cir. 1977) (leaving open the possible use of Rule 33 for ineffective assistance claims); *United States v. Swallow,* 511 F.2d 514, 524 (10th Cir.), *cert. denied,* 423 U.S. 845, 96 S.Ct. 82, 46 L.Ed.2d 66 (1975).

*Affirmed.*