UNITED STATES of America, Appellee,

v.

UNION NACIONAL de TRABAJA-DORES et al., Defendants, Appellants.

No. 77–1099.

United States Court of Appeals, First Circuit.

Argued Feb. 15, 1978.

Decided May 23, 1978.

---

Paul Schachter, New York City, by appointment of the Court, and Jose Antonio Lugo, New York City, with whom Elizabeth M. Schneider, Mark Amsterdam, New York City, and Ismael Delgado Gonzalez, Santurce, P. R., were on brief for appellants.

Barbara A. Atkin, Atty., N. L. R. B., and Lubomyr M. Jachnycky, Atty., Dept. of Justice, Washington, D. C., with whom John S. Irving, Gen. Counsel, N. L. R. B., John E. Higgins, Jr., Deputy Gen. Counsel, N. L. R. B., Harold J. Datz, Assoc. Gen. Counsel, N. L. R. B., Joseph E. Mayer, Asst. Gen. Counsel, N. L. R. B., Benjamin R. Civiletti, Asst. Atty. Gen., Dept. of Justice, George W. Calhoun, and Benjamin C. Flannagan, IV, Attys., Dept. of Justice, were on brief, for appellee.

Before CAMPBELL, MOORE * and BOWNES, Circuit Judges.

LEVIN H. CAMPBELL, Circuit Judge.

On August 30, 1973, the district court issued an injunction pursuant to 29 U.S.C. § 160(j) prohibiting the Union Nacional de Trabajadores from continuing an economic strike at two construction sites in violation of § 158(b)(3) & (d). The injunction ran against the Union and "its officers, representatives, agents, servants, . . . and all members and persons acting in concert or participation with it." They were pro-

* Of the Second Circuit, sitting by designation.

hibited from "continuing, or inducing any employee to continue the current strike," or engaging in picketing or other strike activity at the construction site. Also prohibited were "[f]ailing or refusing forthwith to instruct . . . members and all employees" that they should cease striking, and "[f]ailing or refusing to take all steps necessary" to see that the injunction was complied with.

The strike allegedly continued in violation of the injunction, prompting the United States on September 18, 1973, to file an information charging criminal contempt. The information charged the Union, its President, Arturo Grant, and its Secretary-Treasurer, Radames Acosta Cepeda, with having "violated, resisted and disobeyed" the injunction. They were charged with (a) continuing the strike, (b) failing and refusing to instruct members to return to work, (c) publicly announcing that the injunction was of no force and would be ignored, and (d) conducting a demonstration in which pickets carried signs announcing defiance of the injunction. It was also alleged that (e) Acosta entered one of the construction sites being struck "and threatened the few non-striking employees present with death or other grievous injury."

A trial without jury took place in September 1976. After the Government had presented its case, the court dismissed for lack of evidence that part of the information denominated (c), charging a public announcement by the defendants in defiance of the injunction. The defendants did not present evidence. The court thereupon acquitted Grant but held the Union and Acosta guilty of criminal contempt. The court sentenced Acosta to three months imprisonment and fined the Union $500. Acosta and the Union raise a number of issues on appeal.

I. *Sufficiency of the Evidence.*

■ Appellants appear to argue that the information must be read as charging a single act of contempt consisting of five elements denominated (a) through (e), each of which had to be proven beyond a reasonable doubt in order to convict. While the Government agrees that only a single contempt charge was lodged against each defendant, it sees the acts (a) through (e) as separate instances of non-compliance, any one of which suffices to establish guilt if proven. This interpretation was explained to defense counsel at a pre-trial conference:

"Mr. Anglada [Assistant U.S. Attorney]: The elements of the offense are that the injunctive order was not complied with in the sense that it was disobeyed.

"Ms. Schneider [defendant's attorney]: And A through F [*sic*] constitute the elements.

"Mr. Anglada: These are examples of non-compliance. As a matter of fact, if we prove one incident of non-compliance would be sufficient [*sic*] to establish the guilt of the Defendants."

There is no reason the Government could not proceed in this manner. *See United States v. Blanchard*, 495 F.2d 1329, 1332 (1st Cir. 1974); *cf. United States v. Carlson*, 561 F.2d 105, 108 (1st Cir. 1977). To the extent the information was unclear on this score, any confusion was removed by the prosecution's explanation prior to trial.

■ Appellants next argue that the Government failed to establish that the Union or Acosta were served with the injunction, a necessary element of the Government's case. The prosecution sought to prove service by introducing a certified copy of the marshal's return which stated that he had served the injunction on "Union Nacional de Trabajadores thru Radames Acosta Cepeda Sec.-Trs." The only objection to this document raised below and thus preserved for review,[1] was that the return was hearsay:

"That is a hearsay document that they intend to introduce. We would like to hear what they have to say about it."

At common law the sheriff's return was admissible under the "official records" exception to the hearsay rule. 5 J. Wigmore,

---

1. *See United States v. Guest*, 514 F.2d 777, 779 (1st Cir. 1975).

Evidence § 1664 (1974 ed.); *cf. Publix Food Market, Inc. v. Bitar*, 156 F.Supp. 274 (D.Mass.1957). Appellants argue, however, that the recent codification of the "official records" exception in the Federal Rules of Evidence must be read to exclude such returns as evidence in criminal cases. Fed.R. Evid. 803(8) provides for admissibility of

"Records, reports, statements, or data compilations, in any form, of public offices or agencies, setting forth . . .
(B) matters observed pursuant to duty imposed by law as to which matters there was a duty to report, excluding, however, in criminal cases matters observed by police officers and other law enforcement personnel . . . ."

Appellants argue that Rule 803(8) excludes the return in this case since the United States Marshals are "law enforcement personnel" and the return relates to "matters observed" by one of them in connection with a "criminal case." We find no merit in this argument. There is nothing to indicate that Congress meant to cut back upon the common law rule respecting sheriff's returns. A sheriff or marshal reporting the service of process is not reporting in the capacity of a police observer at the scene of a crime, nor is he ordinarily connected with the case in a law enforcement capacity. The "adversarial" circumstances which might render a law enforcement officer's observations unreliable are unlikely, therefore, to be present:

"Ostensibly, the reason for this exclusion is that observations by police officers at the scene of the crime or the apprehension of the defendant are not as reliable as observations by public officials in other cases because of the adversarial nature of the confrontation between the police and the defendant in criminal cases."

S.Rep.No.1277, 93d Cong., 2d Sess., reprinted in 4 U.S.Code Cong. & Admin. News, pp. 7051, 7064 (1974). In the present case, the injunction was served, and the return of service endorsed, at a time well prior to the alleged contemptuous acts for which appellants were prosecuted. There could have been no motive to falsify for the reason suggested in the above-quoted Senate Report.

We turn next to appellants' argument that there was not sufficient evidence to support the court's findings that they had engaged in the acts set out in items (a), (b), (d) and (e) of the information. We first review the evidence with respect to the actions of appellant Acosta, and then discuss the Union's liability.

The evidence was overwhelming that the strike continued until after the filing of the criminal information. The construction company's president, Dickinson, so testified and the company's payroll records, indicating massive absenteeism, bear him out. Dickinson also testified that during the time that the injunction was in effect he witnessed a picket line of about 40 persons in front of the NLRB's regional office in San Juan. Some of the pickets carried signs expressing defiance and disobedience of the injunction. In the picket line, though not carrying signs, were appellant Acosta and the acquitted Union President Grant.

Another witness, Rivera, a former foreman for the construction company, testified that, during the period that the injunction was in effect, Acosta, accompanied by a "union delegate" Pichardo and other union members came to a construction site gate. Acosta broadcast through a bullhorn a threat to Rivera and another to the effect that they were breaking the strike, that there had already been one death and that theirs might be the next ones. About half the workforce left the site shortly after the threat. Another witness, Segala, testified to the same events.[2] Segala also testified that he saw Acosta regularly loitering at a site gate daily with other strikers. Another

**2.** There is no merit in appellants' claim that Segala's and Rivera's testimony was rendered incredible by the fact that they had been well-rehearsed prior to trial and there were some inconsistencies in their recollections of collateral matters. The credibility of witnesses is normally for the trier of fact; nothing presented comes close to constituting grounds for an appellate court to upset the crediting of these witnesses' observations.

witness, Ponce, testified that he regularly saw another union officer, Romero, loitering with strikers at a site gate. There was placed in evidence a telegram received by the NLRB on September 18 in which Grant and Acosta, on behalf of the Union, announced that the employees were prepared to return to work.

From this evidence the court could determine that Acosta "continued the strike" as charged in item (a), and that he threatened non-strikers as charged in (e). From his pattern of conduct it could also find that he "failed and refused to instruct . . . members" to cease striking as charged in (b). It could also be found that Acosta participated in the picket line at the NLRB office, as charged in (d), and was thereby "supporting, sanctioning, approving or continuing in effect" the strike.[3] There was therefore ample proof to support the court's conclusion that Acosta "knowingly and willfully and with intent to do so, defied, disobeyed and violated the provisions of this Court's Order . . . ."

■ The Union argues that the court erred in finding it guilty of contempt since the proof did not satisfy the Norris-LaGuardia Act's high standard of vicarious liability:

> "No . . . [union] participating or interested in a labor dispute, shall be held responsible or liable in any court of the United States for the unlawful acts of individual officers, members, or agents, except upon clear proof of actual participation in, or actual authorization of, such acts, or of ratification of such acts after actual knowledge thereof."

29 U.S.C. § 106. The injunction in the present case was issued under one of the Taft-Hartley Act's exceptions to the Norris-LaGuardia Act. There does not appear to be any room left for arguing that Norris-LaGuardia's restraints apply in contempt actions arising under the Taft-Hartley Act. *See Muniz v. Hoffman,* 422 U.S. 454, 463–67, 95 S.Ct. 2178, 45 L.Ed.2d 319 (1975)

(quoting legislative history); *Squillacote v. Local 248, Meat & Allied Food Workers,* 534 F.2d 735, 747 (7th Cir. 1976). In a civil contempt proceeding under Taft-Hartley the Seventh Circuit has held that the unrepudiated actions of union officials alone will subject the union to liability. *Squillacote, supra* at 748; *see* 29 U.S.C. § 152(13) (agency of union officials will render union liable for violations of Taft-Hartley Act's provisions). No case appears to have decided what standards will be applied to determine the vicarious liability of a union for criminal contempt of a Taft-Hartley injunction. In this case, however, there is no need to determine whether the simple agency standard of liability in Taft-Hartley, 29 U.S.C. § 152(13), applies, or whether a stricter standard approaching the Norris-LaGuardia threshold should be imposed. Even under a strict standard, the evidence supports the finding of Union liability.

Payroll records introduced at trial support the inference that up to 80% of the construction company's employees were striking. The evidence also showed that a large demonstration in defiance of the injunction was held at the NLRB office and that groups of strikers regularly loitered around the construction sites. That the walkout was not a wildcat strike but was endorsed by the Union itself is indicated not only by Secretary-Treasurer Acosta's heavy involvement in strike activities but by the telegram announcing for the Union that the men would return to work. It could be deduced from the testimony, moreover, that at least two other Union officials, Romero and Pichardo, had participated in the strike. By contrast, there was no evidence of Union efforts to disassociate itself from the strike or to encourage compliance with the injunction. It is true that Union President Grant was acquitted. Presumably this was because of the rather skimpy evidence of his personal involvement, the proof being mainly limited to Grant's appearance in the picket line at the NLRB office. But his

---

**3.** We reject Acosta's contention that the first amendment shielded his expressions of support for the strike from regulation by injunction.

*See NLRB v. Gissel Packing Co.,* 395 U.S. 575, 616–20, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969).

acquittal shows only that the court was not satisfied that the case against him was adequate to establish guilt beyond a reasonable doubt; acquittal is not tantamount to an affirmative finding by the judge that the defendant was uninvolved in the strike. Certainly Grant's acquittal does not support any inference that he or any other Union officials had taken steps to effect compliance with the injunction as directed. On the entire record, which points strongly in the direction of full Union involvement in the strike and contains not the slightest hint of disagreement between the Union and its striking adherents, we believe that the district court could properly adjudge the Union in criminal contempt.

## II. *Wiretapping.*

Appellants argue that the Government's responses to their demands for disclosure of electronic surveillance were inadequate and that the case must be remanded for a full hearing on this issue. Appellants' claim falls into two categories: that their fourth amendment rights may have been violated by the introduction of evidence tainted by illegal wiretapping and that their sixth amendment right to the effective assistance of counsel may have been compromised by wiretapping intruding on the attorney-client relationship.

 We turn first to the fourth amendment claims. Challenges to the introduction of evidence allegedly tainted by illegal wiretapping are governed by 18 U.S.C. § 3504(a)(1), which requires the Government when challenged to "affirm or deny the occurrence of the alleged unlawful act." In this case the Government filed a number of denials of any wiretapping of defend-

ants, the last and most comprehensive of which was filed shortly after defendants were found guilty. This last affidavit stated that the Justice Department had canvassed all law enforcement agencies of the federal government having any likelihood of having overheard defendants and that no wiretapping had occurred. There was thus "an explicit assurance indicating that all agencies providing information relevant to the inquiry were canvassed." *In re Quinn*, 525 F.2d 222, 226 (1st Cir. 1975). Nor do we see how the lateness of the filing of the last affidavit prejudiced appellants.[4] They do not suggest that they have any information to undermine the affiant's assertions which they were somehow prevented from developing because of the Government's tardiness. Nor is it suggested that such information exists for use in a hearing on remand.

Not only were the denials sufficient, but we fail to see any likelihood that any of the evidence used to convict appellants could have been the fruit of wiretapping. The conduct giving rise to the contempt charges—the continued strike in disobedience of the injunction—was out in the open for all to see. Documentary proof consisted of a telegram which the Union sent to the NLRB and the payroll records of the construction company. Testimonial evidence consisted of the eyewitness observations of construction company employees at the time of the strike. It strains credulity to suggest that the Government came upon any of this evidence as a result of electronic surveillance.[5]

Appellants' sixth amendment claim relies not on the possibility that evidence used to convict the defendants may have been

4. Appellants' reliance on *In re Marx*, 451 F.2d 466 (1st Cir. 1971), is misplaced. The tardiness of the affidavit denying wiretapping in that case was prejudicial to Marx in that she had been held in contempt in the district court for refusing to answer a grand jury's questions despite that fact that "no sufficient disclaimer of personal taps . . . was [arguably] made until the case reached this court." *Id.* at 469. This court therefore vacated the contempt order. The lateness of the Government's disclaimer, however, did not prevent this court

from holding it adequate and ruling that, the matter having been resolved against Marx, she would thereafter be required to respond to the grand jury's questions. *Id.*

5. We also reject appellants' argument that the Government inadequately denied receipt of tainted evidence from Commonwealth authorities. We fail to see any reasonable likelihood that evidence used in this case was the fruit of wiretapping by Commonwealth officials.

tainted but on the possibility that governmental intrusions on the attorney-client relationship may have poisoned the proceeding. *See O'Brien v. United States*, 386 U.S. 345, 87 S.Ct. 1158, 18 L.Ed.2d 94 (1966); *Black v. United States*, 385 U.S. 26, 87 S.Ct. 190, 17 L.Ed.2d 26 (1966). Since 18 U.S.C. § 3504(a)(1) relates only to claims that tainted evidence may be relied on by the Government, its provisions are not strictly applicable. But even if we were to recognize for purposes of the sixth amendment a duty to "affirm or deny the occurrence of the alleged unlawful act", we think that the Government has sufficiently satisfied its obligations in the present circumstances.

▆ After reciting that ten named federal law enforcement agencies had been canvassed for affirmance or denial of whether they had conducted "electronic surveillance of the defendants or their counsel", the last-filed affidavit stated that,

> "In accordance with our obligations concerning any attorney-client overhearings, we are not aware of any overhearings of any of the attorneys connected with this case which involve this case."

It is true, as appellants contend, that the phrase "we are not aware" standing alone suggests a less-than-complete investigation which might not pass muster under § 3504. *See In re Quinn, supra* at 225 n.5. But the affidavit, read in its entirety, constitutes a denial that any of the agencies surveyed had engaged in "any overhearings of any of the attorneys connected with this case which involve this case." The question then becomes whether the implication contained in this denial that some of the attorneys may have been overheard in connection with matters unrelated to the case warranted further exploration by the district court.

▆ It is argued that *Alderman v. United States*, 394 U.S. 165, 89 S.Ct. 961, 22 L.Ed.2d 176 (1969), requires disclosure of the fruits of the wiretap as well as an evidentiary hearing once a governmental admission of illegal wiretapping has been made. But it is going some distance to say that the Government's response here constitutes an admission of wiretapping. And

even were we to infer such an admission, we are faced with very substantial differences between the present situation and that in *Alderman*. In *Alderman*, the defendants themselves (not their attorneys) had been overheard illegally and a violation of the defendants' fourth amendment rights was clearly established. In ruling that the fruits of the wiretaps would have to be disclosed, the Court noted that defendants still had to demonstrate taint:

> "With this task ahead of them, and if the hearings are to be more than a formality and petitioners not left entirely to reliance on government testimony, there should be turned over to them the records of those overheard conversations which the Government was not entitled to use in building its case against them."

Id. at 183, 89 S.Ct. at 972. In the present case, defendants have not made any threshold showing that their sixth amendment (much less fourth amendment) rights have been infringed. At most the Government has inferentially admitted an intrusion on the attorneys' fourth amendment rights. Defendants, of course, may not assert the rights of third parties, including their attorneys, in arguing that their own rights have been violated. *See United States v. Calandra*, 414 U.S. 338, 348, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974). And no reason has been given to disbelieve the Government's assertion that no wiretapping intruded on the attorneys' confidences relating to this case. The most appellants have been able to allege is that in the months and years preceding the attorneys' work on this case they occasionally heard suspicious noises on their telephones. There was no claim that the suspicious noises continued after the attorneys had been retained for work on this case. The Government's affidavit adequately and categorically denied than any defendants had been overheard, further foreclosing the likelihood that communications protected by the sixth amendment's right to counsel· had been intercepted. There is, moreover, nothing in the record to suggest that any other form of privileged communications by the attorneys had been

overheard. We therefore find no merit in any of the appellants' challenges to their convictions based upon wiretapping assertions.

### III. *Selective Prosecution.*

Before trial, appellants moved to dismiss on grounds that the Government was engaged in selective or discriminatory prosecution in violation of their rights to due process and equal protection. In support of their motion defendants submitted memoranda and affidavits which claimed that in the preceding five years the NLRB in Puerto Rico had sought injunctions against illegal strikes ten times, three of which cases were brought against the defendant Union. It was also claimed that "[a]pparently in other criminal contempt proceedings sought by the NLRB, only the unions and not the officers have been named defendants." Appellants also alleged that it was well known that Acosta and other prominent members of the Union were active in the Puerto Rico Socialist Party and that the newspaper of the party in 1972 had exposed corruption in the local NLRB office. Before the exposure, it was claimed, the NLRB had not sought to enjoin any of the Union's strike activities; after publication, three injunctions were sought. The district court denied that motion as well as one for an evidentiary hearing. Appellants now contend that their allegations merited at least an evidentiary hearing.

█ Prosecutors are entitled to broad discretion in deciding which cases to prosecute and a defendant seeking to dismiss an indictment bears a heavy burden on showing that the prosecutor's discretion was invidiously exercised. *See United States v. Falk*, 479 F.2d 616, 620–21 (7th Cir. 1973).

"To support a defense of selective or discriminatory prosecution, a defendant bears the heavy burden of establishing, at least *prima facie*, (1) that, while others similarly situated have not generally been proceeded against because of conduct of the type forming the basis of the charge against him, he has been singled out for prosecution, and (2) that the government's discriminatory selection of him for prosecution has been invidious or in bad faith, i.e., based upon such impermissible considerations as race, religion, or the desire to prevent his exercise of constitutional rights."

*United States v. Berrios*, 501 F.2d 1207, 1211 (2d Cir. 1974). Appellants have failed to meet this burden here.

That the NLRB brought only ten injunctive actions against unions in Puerto Rico in the five years preceding the information in this case is by itself not significant. It may be as easily assumed as not that only ten strikes warranted such extraordinary relief. Appellants have failed to show that there were significantly more than ten strikes of a similar character which were ignored by the NLRB. The claim that Acosta is the first union official in Puerto Rico to be charged with criminal contempt is also not significant in and of itself. Appellants have failed to show that other union officials have engaged with impunity in conduct similar to his violative of a court's order. We also ascribe little significance to the claim that injunctive actions were brought only after the Union's attacks on the NLRB in Puerto Rico. Appellants have not shown that prior to the newspaper's expose the Union was engaged in strike activity similar to that involved here which went unchallenged by the NLRB. On these inconclusive allegations, the district court did not abuse its discretion in denying an evidentiary hearing and denying the motion to dismiss.

We have examined appellants' remaining claims, including those that the Government's failure to disclose potential witnesses' names and notes of interviews with witnesses merited dismissal. We cannot say that the court abused its discretion in accepting the Government's explanations for the tardiness of its disclosures and the destruction of certain documents.

*Affirmed.*