**UNITED STATES of America**

v.

**John R. TORQUATO, Appellant.**

**No. 78–2577.**

United States Court of Appeals, Third Circuit.

Argued June 6, 1979.

Decided July 5, 1979.

1974), *cert. denied,* 420 U.S. 909, 95 S.Ct. 829, 42 L.Ed.2d 839 (1975).

Robert J. Cindrich, U. S. Atty., Alexander H. Lindsay, Jr. (argued), Asst. U. S. Atty., Pittsburgh, Pa., for appellee.

Thomas A. Livingston (argued), Dennis J. Clark, Livingston, Miller, O'Malley & Clark, Pittsburgh, Pa., for appellant.

Before WEIS and GARTH, Circuit Judges, and GERRY,* District Judge.

## OPINION OF THE COURT

GARTH, Circuit Judge.

John R. Torquato appeals from the judgment of sentence entered upon his conviction for conspiring with others to violate the Hobbs Act, 18 U.S.C. § 1951, and for substantive violations of that Act. He raises a number of legal issues on appeal, only one of which we think merits discussion. This one issue is whether Torquato made a sufficient threshold showing of selective prosecution to entitle him to an evidentiary hearing in which he could explore the factual predicate for his claim of unlawful discrimination on the part of the government in subjecting him to prosecution.

Based upon our review of the evidence presented to the district court, we conclude that Torquato failed to establish a showing of selective prosecution sufficient to entitle him to an evidentiary hearing. Additionally, we hold that his other claims are without merit. We therefore affirm Torquato's judgment of sentence.

## I

The evidence adduced at trial indicates that from 1971 to 1976 Torquato, along with John George and Harold G. Stevens,[1] extorted funds from persons who leased heavy equipment to the Pennsylvania Department of Transportation ("PennDOT") in Cambria County, Pennsylvania. Torquato was the County Chairman of the Democratic Party in Cambria County from 1971 until 1978. He also held the position, during the years relevant to the indictment, of Supervisor of County Audits in the Department of Auditor General for the Commonwealth of Pennsylvania. During all times relevant to this case, George was an Assistant Superintendent of Highways for PennDOT in Cambria County.

According to testimony at trial, Torquato, because of his position as County Chairman, held de facto power to determine who would obtain work or contracts with PennDOT in Cambria County. Several lessors of heavy equipment testified that they had

---

* The Honorable John F. Gerry, United States District Judge for the District of New Jersey sitting by designation.

1. A thirty-one count indictment was returned against Torquato and co-defendants John George and Harold G. Stevens. The first count charged Torquato, George, and Stevens with conspiracy to violate the Hobbs Act. The remaining thirty counts charged thirty specific instances of extortion from equipment lessors.

Torquato was found guilty of all thirty-one counts. George was found guilty of thirty counts, and not guilty of one. Stevens was found guilty of two counts, and not guilty of twenty nine.

We have disposed of Torquato's appeal in this opinion. George's appeal has been decided in *United States v. George*, 602 F.2d 573 (3d Cir. 1979) (per curiam). Stevens's appeal is not before us.

meetings with Torquato in which they sought his approval to enter into leases with PennDOT. During these meetings, Torquato would indicate that the *quid pro quo* for obtaining a lease with the state would be payment of a percentage kickback "to the party." It was the understanding of the lessors, as reflected in their testimony, that PennDOT would lease their equipment only if they made such kickbacks. In 1971, the required payment was five percent of a lessor's gross income from PennDOT. This amount was increased to ten percent in the fall of 1972.[2]

Most of the kickback payments were collected by George. Several witnesses testified that George would come to their place of business or job site to collect a percentage payment at the time of the arrival of their twice monthly rental payment from PennDOT. According to a number of government witnesses, when George collected money or discussed payments with them, he would indicate that he was acting under the direction of Torquato. George himself testified that he collected money from various lessors of equipment in Cambria County, and that he did so at the behest of Torquato.[3] He further testified that when he collected the money, he would immediately turn it over to Torquato.

Although the kickback payments made by the lessors were often characterized at trial as "political donations" or "contributions," the evidence would indicate that these payments benefited Torquato personally, and not the Democratic Party. With respect to those payments made by check, an employee of the Laurel National Bank testified that the checks had been cashed rather than deposited in any account.[4] This testimony was corroborated by that of Janell Morana, a secretary for the Cambria County Democratic Committee. Morana testified that

she received all of the Party's money, recorded it, and deposited it into appropriate accounts. After examining the kickback checks that had been submitted into evidence, she testified that she had cashed them all at the direction of Torquato. When the checks were cashed, the proceeds were placed in an envelope and returned to Torquato. Morana further testified that at the time George was collecting large sums of cash from various lessors, she received no cash to deposit in the Party's account.

In addition to the foregoing, the government introduced evidence that the activities of the lessors affected interstate commerce and that Torquato and George attempted to impede an investigation of their activities conducted by the Federal Bureau of Investigation. On June 29, 1978, a jury found Torquato guilty of conspiring to violate the Hobbs Act, and of various substantive violations of that Act.

During the trial of this case, Torquato's attorney requested that the government make available to him a report which he understood had been prepared by a committee of the Pennsylvania House of Representatives investigating state contract practices in Cambria County. In response to the request, the government attorneys stated that they had looked for but could not find the report. Subsequent to the trial, they disclosed that they had found two reports and turned them over to Torquato's counsel. One report is entitled "Final Report—Pennsylvania House of Representatives Select Committee on State Contract Practices." However, the cover sheet indicates that it is an "Initial Draft" submitted by two men identified as "special counsel." (Hereinafter, this report will be referred to as the "Initial Draft).)" The other report, as it appears in the record, lacks a cover sheet. Nonetheless, the parties are in agreement

---

**2.** According to trial testimony, payments were initially made by check. After May, 1971, however, Torquato required that all payments be made in cash.

**3.** George testified that before embarking on his collection duties, he would receive from Torquato a list of various persons leasing equipment to PennDOT, the income those persons

received from PennDOT, and the amount of money that Torquato claimed was due him from those persons.

**4.** The bank employee was able to make this determination based on information encoded on the checks.

that this report is actually the final report of the House Committee. (Hereinafter, this report will be referred to as the "Final Report)."

Based on the information contained in these reports, as well as on other evidence submitted to the district court, Torquato filed post-trial motions to dismiss the indictment and to accord him an evidentiary hearing on the issue of selective prosecution.[5] The basis for these post-trial motions was the claim that the United States Attorney for the Western District of Pennsylvania possessed information which indicated that Robert Gleason, Chairman of the Republican Party in Cambria County, had extorted funds from lessors when the Republican Party was in office prior to 1971. Torquato argued that the failure of the United States Attorney to prosecute Gleason within the statute of limitations period,[6] despite this evidence, made his own prosecution discriminatory and unlawful. He contended that they had made a sufficient prima facie showing to be entitled to an evidentiary hearing on this issue, and that the appropriate remedy for such selective prosecution was dismissal of the indictment. His post-trial motions were denied by the district court, and this appeal followed.

## II

▪ The government is not entirely unconstrained in its choice of those whom it will prosecute. As long ago as *Yick Wo v. Hopkins*, 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220 (1886), Justice Matthews wrote for the Supreme Court that "if [a law] is applied and administered by public authority with an evil eye and an unequal hand, so as practically to make unjust and illegal discriminations between persons in similar circumstances, material to their rights, the denial of equal justice is still within the prohibition of the constitution." *Id.* at 373–74, 6 S.Ct. at 1073. To permit criminal prosecutions to be initiated on the basis of arbitrary or irrational factors would be to transform the prosecutorial function from one protecting the public interest through impartial enforcement of the rule of law to one permitting the exercise of prosecutorial power based on personal or political bias. "Nothing can corrode respect for a rule of law more than the knowledge that the government looks beyond the law itself to arbitrary considerations, such as race, religion, or control over the defendant's exercise of his constitutional rights, as the basis for determining its applicability." *United States v. Berrios*, 501 F.2d 1207, 1209 (2d Cir. 1974). It is the wisdom of our Constitution that such personal abuses of governmental power are proscribed.[7]

▪ In considering a claim of selective prosecution in *United States v. Berrigan*, 482 F.2d 171, 174 (3d Cir. 1973), this court stated that "although the government is permitted 'the conscious exercise of some selectivity' in the enforcement of its criminal laws, *Oyler v. Boles*, 368 U.S. 448, 456, 82 S.Ct. 501, 506, 7 L.Ed.2d 446 (1962), any 'systematic discrimination' in enforcement, [*United States v. Robinson*, 311 F.Supp. 1063, 1065 (W.D.Mo.1969)], or 'unjust and illegal discrimination between persons in similar circumstances,' *Yick Wo, supra*, 118 U.S. at 374, 6 S.Ct. at 1073, violates the equal protection clause and renders the prosecution invalid." Unequal application of the criminal laws does not amount to a constitutional violation, however, "unless there is shown to be present in it an element of intentional or purposeful discrimination." *Snowden v. Hughes*, 321 U.S. 1, 8,

---

**5.** Torquato also moved for a new trial and for a judgment of acquittal. Both of these motions were denied by the district court.

**6.** Torquato suggests that the statute of limitations for a Hobbs Act prosecution of Gleason expired on January 19, 1976. Brief for Appellant Torquato at 12. Without deciding the is-

sue, for purposes of this case we will assume that prosecution of Gleason is now barred by the statute of limitations.

**7.** Federal prosecutors are governed by the equal protection principle of the Fifth Amendment. *See Bolling v. Sharpe*, 347 U.S. 497, 74 S.Ct. 693, 98 L.Ed. 884 (1954).

64 S.Ct. 397, 88 L.Ed. 497 (1944).[8] *See Washington v. Davis*, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976). The burden of proving such discrimination is placed upon the defendants. *United States v. Malinowski*, 472 F.2d 850, 860 (3d Cir. 1973).[9]

■ Although the government is held accountable under the Constitution so that it may not engage in selective prosecutions, courts have endeavored to create procedural mechanisms by which defendants may raise such claims without interfering unduly with the broad prosecutorial authority vested in the executive branch. The concept of separation of powers underlies the courts' concern that the prosecutorial function be relatively untrammeled. *See United States v. Johnson*, 577 F.2d 1304, 1307 (5th Cir. 1978). This is especially true at the incipient stages of a prosecution. "In formulating and prosecuting its case, the government must be relatively unconstrained in its deployment of resources. The choice of whom to prosecute and the strategy of prosecution

are generally matters left wholly to the government's control." *United States v. Herman*, 589 F.2d 1191, 1210 (3d Cir. 1978) (Garth, J., concurring in part and dissenting in part), *cert. denied,* —— U.S. ——, 99 S.Ct. 2014, 60 L.Ed.2d 386 (1979).[10] These separation of powers concerns are reinforced by the presumption that "a prosecution for violation of a criminal law is undertaken in good faith and in nondiscriminatory fashion for the purpose of fulfilling a duty to bring violators to justice." *United States v. Falk*, 479 F.2d 616, 620 (7th Cir. 1973) (en banc).

■ In order to minimize the intrusion on the prosecutorial function and still enable a defendant effectively to raise a claim of selective prosecution, the defendant is obligated to make a threshold showing of discriminatory prosecution before an evidentiary hearing will be accorded on this issue. *United States v. Berrigan*, 482 F.2d 171, 181 (3d Cir. 1973); *United States v.*

---

**8.** The concept of "intentional and purposeful discrimination" was explained in *United States v. Berrios*, 501 F.2d 1207, 1211 (2d Cir. 1974), as follows:

> To support a defense of selective or discriminatory [sic] prosecution, a defendant bears the heavy burden of establishing, at least prima facie, (1) that, while others similarly situated have not generally been proceeded against because of conduct of the type forming the basis of the charge against him, he has been singled out for prosecution, and (2) that the government's discriminatory selection of him for prosecution has been invidious or in bad faith, i.e., based upon such impermissible considerations as race, religion, or the desire to prevent his exercise of constitutional rights. These two essential elements are sometimes referred to as "intentional and purposeful discrimination."

**9.** In *Oyler v. Boles*, 368 U.S. 448, 82 S.Ct. 501, 7 L.Ed.2d 446 (1962), the Supreme Court rejected a claim of selective prosecution on the ground that "it was not stated that the selection was deliberately based upon an unjustifiable standard such as race, religion, or other arbitrary classification." *Id.* at 456, 82 S.Ct. at 506. Following this decision, there was some question whether a defendant claiming selective prosecution was required to show that he or she was a member of a class against which the law was being selectively enforced. *See* The Supreme Court, 1961 Term, 76 Harv.L.Rev. 54, 120–21 (1962). Our decision in *United States*

*v. Berrigan*, 482 F.2d 171 (3d Cir. 1973), implicitly assumed that relief would be available when intentional or purposeful discrimination was practiced against an individual (even though the discrimination was not class-based), and we agree with other decisions which have reached that result. *E.g., United States v. Falk*, 479 F.2d 616, 619 (7th Cir. 1973) (en banc); *Moss v. Hornig*, 314 F.2d 89, 93 (2d Cir. 1963). Thus, although we may assume for this case that prosecutorial decisions based on the defendants' membership in one political party or another are the sort of "arbitrary classification" contemplated by *Oyler v. Boles*, 368 U.S. at 456, 82 S.Ct. 501, it is clear that Torquato could raise his claim of selective prosecution based on individual discrimination. Moreover, membership in a political party is protected by the First Amendment, and the mere exercise of that right cannot be punished by means of selective prosecution. *See United States v. Falk, supra; United States v. Steele*, 461 F.2d 1148 (9th Cir. 1972).

**10.** Decisions made by the government concerning the initiation of prosecution will not usually affect the availability of relevant evidence at trial in such a way as to invoke the court's interest in the accuracy of the trial process. *See United States v. Herman*, 589 F.2d 1191, 1205 (Garth, J., concurring in part and dissenting in part), *cert. denied,* —— U.S. ——, 99 S.Ct. 2014, 60 L.Ed.2d 386 (1979).

*Union Nacional de Trabajadores,* 576 F.2d 388, 395 (1st Cir. 1978); *United States v. Wallace,* 578 F.2d 735, 740 (8th Cir.), *cert. denied* 439 U.S. 898, 99 S.Ct. 263, 58 L.Ed.2d 246 (1978); *United States v. Oaks,* 508 F.2d 1403, 1404 (9th Cir. 1974); *United States v. Berrios,* 501 F.2d 1207, 1211 (2d Cir. 1974). *See United States v. Falk,* 479 F.2d 616, 620–21 (7th Cir. 1973) (en banc); *United States v. Steele,* 461 F.2d 1148, 1152 (9th Cir. 1972); *United States v. Crowthers,* 456 F.2d 1074, 1078 (4th Cir. 1972). The defendant bears the burden of proving a "colorable entitlement," *United States v. Berrigan,* 482 F.2d at 181, to the claim of selective prosecution. Some credible evidence must be adduced indicating that the government intentionally and purposefully discriminated against the defendant by failing to prosecute other similarly situated persons.

## III

■ Our view of the evidence adduced by Torquato in support of his claim of selective prosecution leads us to agree with the district court that he has not made a sufficient threshold showing of selective prosecution to entitle him to an evidentiary hearing.

11. The only difference between the Initial Draft and the Final Report is that all names mentioned in the former were expurgated from the latter. The district court concluded that the United States Attorney's Office "had both versions of the Report." That determination has not been challenged on appeal.

12. It appears that the evidence received by the Committee enabled it to conclude that only under the Democratic administration were kickbacks actually extorted. There was testimony to the effect that payments made under the Republican administration were voluntary, but that they became compulsory under the Democratic administration. For example, the Initial Draft summarizes the information provided by Robert Noel, an equipment lessor, as follows:

II. Robert Noel was interviewed by investigators of this Committee and advised that he had leased to PennDOT for approximately 13 years, mostly during snow removal season. Until the present administration took over, Noel would make periodic voluntary contributions to the Republican Party in amounts

The principal evidence upon which Torquato relies is the Initial Draft and Final Report of the Pennsylvania House of Representatives Select Committee on State Contract Practices.[11] Neither of these reports supports their position, however. These reports state that under both Republican and Democratic administrations, Party officials in Cambria County engaged in an extensive practice of "macing" PennDOT employees—i.e., each employee was required to kickback 2% of his paycheck in order to retain his job. Notably, however, with respect to the extortion of persons leasing equipment to PennDOT, the Initial Draft states:

In addition to the macing of employees, the investigation of this Committee has revealed that, at least under the present [Democratic] administration, certain lessors have been required to contribute 10% of their earnings from the state in order to continue to lease to PennDOT. Several of these lessors have stated that they fully realize that such a procedure has been mandated by John Torquato.

Thus, by its terms, the report identified only the Democratic administration, and John Torquato, as having extorted kickbacks from equipment lessors.[12]

ranging from $10 to $20. According to Noel, when the present administration took over he began to feel pressure and the need to donate as much money as he could. Noel advised that during the last several years he has given as much as $200 to $300, as many as 3, 4 or 5 times a year. He explained this by saying that he needed the work and that he needed to protect himself.

Torquato calls our attention to the trial testimony of certain government witnesses which he contends establishes that Republican Party officials extorted kickbacks from equipment lessors. We have reviewed this testimony, and find it consistent with other evidence indicating that payments made during the Republican administration were not coerced. Moreover, to the extent such testimony does not suggest that Republican Party officials extorted kickbacks, Torquato has made no showing that the government had access to this information prior to January 19, 1976, the date the statute of limitations purportedly barred prosecution of Republican Party officials. *See* note 5 *supra.*

The other evidence relied upon by Torquato to establish a threshold showing of selective prosecution does not contradict the basic conclusion of the Committee reports that macing was engaged in by both Democratic and Republican officials, but that extortion of kickbacks from equipment lessors was solely the practice of Democratic officials. Correspondence between the Cambria County District Attorney and the United States Attorney's Office contains no substantive information concerning the illegal practices of officials under either the Democratic or Republican administrations. The correspondence reflects no more than arrangements for a meeting between the two offices in order to discuss the Committee's Final Report.[13] A summary of two interviews conducted by State investigators with Becker, an equipment lessor, indicates that Becker considered all payments made under both the Democratic and Republican administrations to be voluntary.[14] The newspaper articles upon which Torquato relies recount the information contained in the Committee reports, report on the trial of Torquato, and discuss statements made in interviews with various persons involved in the investigation. These articles do not, however, suggest the existence of any evidence concerning the extortion by Republican Party officials of kickbacks from equipment lessors.

In sum, the evidence adduced by Torquato in support of his claim of selective prosecution reveals that employees of PennDOT were maced under both the Democratic and Republican administrations. It also reveals that there was evidence that officials under the Democratic administration—namely Torquato and George—extorted kickbacks from persons leasing equipment to PennDOT. Significantly, however, the evidence does not disclose that officials under the Republican administration extorted payments from equipment lessors.

Torquato was prosecuted under the Hobbs Act only for extorting kickbacks from equipment lessors. He was not prosecuted for macing PennDOT employees. In commencing this prosecution, the government could rightfully differentiate between Torquato and Democratic Party officials, on the one hand, and Republican Party officials, on the other, because the Committee reports to which the government had access identified only Democratic Party officials as extorting funds from equipment lessors. Furthermore, the government could understandably refuse to prosecute both Democrats and Republicans for macing PennDOT employees because of the difficulty in establishing that such macing affected interstate commerce—a requisite element of proof in a Hobbs Act prosecution.[15]

The evidence discloses that Gleason, the Republican Party County Chairman, was simply not similarly situated to Torquato with respect to the criminal activity prose-

---

**13.** Torquato apparently also relies on a letter sent to the United States Attorney by Patrick Gleason, Chairman of the House of Representatives Select Committee on State Contract Practices. However, this was merely a cover letter under which the Committee's Final Report was forwarded to the United States Attorney; the letter itself contains no substantive information.

**14.** Although Becker claimed in a June 13, 1972 interview that all payments he made were voluntary, his June 7, 1972 interview suggests that the Democrats exerted greater pressure than did the Republicans in the solicitation of these contributions. The synopsis of the June 7th interview states:

> BECKER related in substance that he and his brother have rented a highlift vehicle to the State for the past eight years. This vehicle was used for loading ashes. He stated that during his first several years of leasing equip-

ment to the Commonwealth under the Republican Administration, he made numerous annual contributions of $15.00, $20.00 and $30.00. Finally the leasers [sic] got together and decided that they would rather give 5% of their fee to the party than make many small donations. This was done until the Democratic party took over. At this time he was told by GEORGE that he would be required to give a 5% kickback for the privilege of continuing to lease equipment to the State.

**15.** At a hearing in the district court on Torquato's motions to dismiss the indictment or hold an evidentiary hearing, the government attorney stated, in response to a question from the court, that proving an effect on interstate commerce is especially difficult with respect to macing of state employees.

cuted by the government. We are therefore satisfied that in the complete absence of evidence that Republican Party officials engaged in the type of activity with which Torquato was charged, the government did not engage in any intentional or purposeful discrimination in proceeding against Torquato. Moreover, the government could do so while at the same time it decided not to seek indictments or prosecute for any macing activities engaged in by officials of either political party. Consequently, we conclude that Torquato failed to make a sufficient threshold showing to be entitled to an evidentiary hearing on the issue of selective prosecution.

## IV

▮  Torquato also contends that there was no evidence of an effect on interstate commerce sufficient to sustain his conviction under the Hobbs Act. A similar argument was advanced in *United States v. Cerilli,* 603 F.2d 415 (3d Cir. 1979), a case involving facts virtually identical to those presented on this appeal. The court in *Cerilli* rejected the contention that extortion of kickbacks from equipment lessors involved an insufficient effect on interstate commerce to sustain Hobbs Act convictions. Considering ourselves bound by *Cerilli,* we hold that Torquato's activities affected interstate commerce to a degree sufficient to sustain his conviction.

▮  Torquato raises the following additional issues:

"II. Whether the lower court erred in refusing to allow defendant-appellant Torquato to inquire into the financial condition of a co-defendant on cross-examination under the particular circumstances of this case and in view of this Court's decision in *United States v. Kenny,* 462 F.2d 1205 (3d Cir. 1972)?

"III. Whether defendant-appellant Torquato was deprived of his constitutional rights to the due process of law and to have compulsory process for obtaining witnesses in his favor as a result of the lower court's erroneous refusal to admit defense testimony in regard to

PennDOT lessors, who viewed the payments to political parties as voluntary and declined to contribute yet retained their PennDOT contracts?

"IV. Whether the lower court erred in refusing defendant-appellant Torquato's repeated motions for mistrial on the basis of admission of testimony of Government witnesses as to statements by George, an alleged co-conspirator, after the conspiracy had terminated?

"V. Whether the evidence is sufficient to sustain the conviction of defendant-appellant Torquato under 18 U.S.C. § 1951, the 'Hobbs Act'?

"VI. Whether, in view of the substantial prejudice arising from the joinder of defendants in the indictment, the lower court abused its discretion by denying defendant-appellant Torquato's motions for severance?

"VII. Whether the admission of evidence concerning the affect of defendant-appellant Torquato's activities on foreign commerce was improper and resulted in an impermissible broadening of the scope of the indictment which only alleged an affect [sic] on interstate commerce?"

Brief for Appellant Torquato at 2–3. We have examined each of these issues, and find them to be without merit.

## V

For the foregoing reasons, the judgment of sentence entered on the conviction of Torquato will be affirmed.