UNITED STATES of America, Appellee,

v.

Raul Enrique
PENAGARICANO–SOLER,
Defendant, Appellant.

No. 87–1365.

United States Court of Appeals,
First Circuit.

Heard Feb. 5, 1990.

Decided Aug. 16, 1990.

Harry Anduze Montano, Hato Rey, P.R., with whom Pia Gallegos, New York City, was on brief, for appellant.

Joseph Douglas Wilson, Dept. of Justice, with whom Daniel F. Lopez–Romo, U.S. Atty., was on brief, for the U.S.

Before CAMPBELL, Chief Judge, and BOWNES and CYR, Circuit Judges.

CYR, Circuit Judge.

Following a five-week jury trial, defendant Raúl Enrique Peñagaricano–Soler, founder and president of Caribbean Federal Savings Bank ("Bank"), was convicted of thirty-two felony offenses stemming from the Bank's failure to report currency transactions as required by law. We affirm the judgment of conviction, but remand to the district court for further sentencing proceedings.

# I

## BACKGROUND

The evidence established, beyond reasonable doubt, that the defendant, over the course of nearly three years (October 28, 1982 through June 6, 1985), conspired with a Bank manager, Alejandro Melendez–Carmona, a Bank vice president, Daniel Calderon Flores, and others unnamed, to cause the Bank to disregard, and to conceal its disregard of, the requirement to file currency transaction reports ("CTR's") in connection with individual currency transactions exceeding $10,000. *See* 31 U.S.C. § 5311 *et seq.*, (Bank Secrecy Act of 1970, as amended).

The evidence demonstrated that twenty-four reportable currency transactions were never reported; in seven of these, the cash nature of the transactions was concealed by falsifying deposit slips. The government weighed in with compelling evidence as to the defendant's state of mind in these matters; particularly, that he personally informed bank examiners, in 1978, 1981, and in early 1982, that the Bank had filed CTR's for all nonexempt cash transactions above $10,000, whereas the evidence at trial showed that the Bank filed no CTR's despite having engaged in more than $1,000,000 in nonexempt currency transactions during the three-year indictment period.

The jury found defendant guilty of conspiracy and of thirty-one substantive crimes. Defendant was sentenced to concurrent four-year prison terms on each substantive charge, to be served consecutively to a four-year prison term imposed on the conspiracy count; and fines totalling $555,000.

# II

## DISCUSSION

The defendant asserts that the convictions must be set aside due to (1) selective prosecution, (2) outrageous governmental conduct, (3) insufficiency of the conspiracy charge, (4) insufficiency of the evidence supporting the conspiracy charge and certain substantive charges, (5) absence of a duty to file CTR's, (6) juror bias; (7) inadequate jury deliberations; and (8) that the court unlawfully imposed an excessive fine which must be set aside.

### (1) *Selective Prosecution*

On June 6, 1985, as a consequence of a massive investigation into bank money-laundering operations—dubbed "Operation Greenback"—an intergovernmental task force arrested defendant and sixteen other Hispanic residents of Puerto Rico for violations of the currency transaction reporting laws. The arrests received considerable media attention, some of it instigated by the government. Defendant claimed selective prosecution, and moved to dismiss the indictment, and for discovery, on representations that several *mainland* banks were assessed civil penalties only, and that their officers were never prosecuted, despite billions of dollars in unreported currency transactions. Defendant pointed to public statements by several high-ranking officials (not connected with Justice or Treasury) that "Operation Greenback" was intended to put mainland bankers on notice, and that the Justice Department had prosecuted very few *mainland* bank officials, in contrast to its "massive raid" on Puerto Rico banks. All allegations were based on press reports.

The government responded that some mainland *bankers* were prosecuted and that a majority of the mainland banks whose officers were not prosecuted had voluntarily disclosed their violations following *internal* audits; hence, the civil penalties. A government affidavit explained that Puerto Rico became a focal point of the investigation after the Federal Reserve detected a disproportionately large cash deposit surplus by Puerto Rico banking institutions during 1982, compared with those in most other jurisdictions. A follow-up analysis indicated that Puerto Rico CTR filings were not commensurate with the volume of currency transactions.

"Operation Greenback" was instituted to investigate possible currency transaction reporting violations. The affidavit re-

vealed that a similar investigation was carried out in Florida. The government produced a partial list of mainland residents prosecuted under the currency transaction reporting laws, with copies of the indictments. The government opposed further discovery, as there had been no *prima facie* showing that its prosecution was motivated by discriminatory *intent*.

In response to a further court order, the government identified mainland *banks* which were under prosecution, and stated that in two-thirds of those cases bank officers had been prosecuted as well. It also listed mainland *banks* convicted of currency transaction reporting violations, together with their officers and employees who had been *prosecuted*. The government resisted further discovery on the ground that the defendant had not demonstrated any discriminatory *effect* from the alleged selective prosecution of currency transaction reporting violations.

The defendant responded that there remained a statistically significant (population-based) numerical disparity between mainland prosecutions and Puerto Rico prosecutions. Defendant argued that the Puerto Rico prosecutions were more severe than those on the mainland, pointing in particular to the numerous charges brought against him. Defendant faulted the government's failure to explain why some mainland banks and bank officers were not prosecuted.

The district court concluded that there was no "colorable basis" for the selective prosecution claim, refused to order further discovery, and denied the motion to dismiss.

More than a century ago the Supreme Court explained in *Yick Wo v. Hopkins*, 118 U.S. 356, 373–74, 6 S.Ct. 1064, 1072–73, 30 L.Ed. 220 (1886), that

> [t]hough the law itself be fair on its face and impartial in appearance, if it is applied and administered by public authority with an evil eye and an unequal hand, so as practically to make unjust and illegal discriminations between persons in similar circumstances, material to their

rights, the denial of equal justice is still within the prohibition of the Constitution.

Now, as ever, the impartial administration of the criminal laws must be managed with limited law enforcement resources, *Oyler v. Boles*, 368 U.S. 448, 456, 82 S.Ct. 501, 506, 7 L.Ed.2d 446 (1962); *see also Bordenkircher v. Hayes*, 434 U.S. 357, 364, 98 S.Ct. 663, 668, 54 L.Ed.2d 604 (1978), which entails the exercise of commensurate prosecutorial discretion in targeting criminal prosecutions, *Wayte v. United States*, 470 U.S. 598, 607, 105 S.Ct. 1524, 1530, 84 L.Ed.2d 547 (1985); *United States v. Goodwin*, 457 U.S. 368, 380 n. 11, 102 S.Ct. 2485, 2492 n. 11, 73 L.Ed.2d 74 (1982); *United States v. Bassford*, 812 F.2d 16, 21–22 (1st Cir.1987). Moreover,

> [s]uch factors as the strength of the case, the prosecution's general deterrence value, the Government's enforcement priorities, and the case's relationship to the Government's overall enforcement plan are not readily susceptible to the kind of analysis the courts are competent to undertake.

*Wayte*, 470 U.S. at 607, 105 S.Ct. at 1530.

Thus, in order to overcome the threshold presumption that the prosecutor acted "in good faith for reasons of sound governmental policy," *United States v. Saade*, 652 F.2d 1126, 1135 (1st Cir.1981) (emphasis added); *see Bassford*, 812 F.2d at 19, the defendant must make a *prima facie* demonstration—

> (1) that, while others similarly situated have not generally been proceeded against because of conduct of the type forming the basis of the charge against him, he has been singled out for prosecution, and (2) that the government's discriminatory selection of him for prosecution has been invidious or in bad faith, i.e., based upon such impermissible considerations as race, religion, or the desire to prevent his exercise of constitutional rights.

*United States v. Union Nacional de Trabajadores*, 576 F.2d 388, 395 (1st Cir.1978) (quoting *United States v. Berrios*, 501 F.2d 1207, 1211 (2d Cir.1974)). If the defendant makes the required *prima facie* showing,

the government must demonstrate the absence of impermissible considerations in its decision to prosecute.

■ A selective prosecution claim merits evidentiary hearing if it alleges sufficient "facts a) tending to show that [defendant] has been selectively prosecuted, and b) raising a reasonable doubt about the propriety of the prosecution's purpose," *Saade*, 652 F.2d at 1135, unless the government can present "countervailing reasons," *id.*

■ The district court's refusal to require further discovery was well within its discretion. *See United States v. Sclamo*, 578 F.2d 888 (1st Cir.1978) (no abuse of discretion where defendant failed to articulate need for witness lists); *United States v. Williams*, 791 F.2d 1383 (9th Cir.) (scope of discovery within discretion of district court; court of appeals reviews for abuse of discretion), *cert. denied sub nom. Sears v. United States*, 479 U.S. 869, 107 S.Ct. 233, 93 L.Ed.2d 159 (1986). The selective prosecution claim was premised entirely on press accounts. No facts were asserted on personal knowledge or on information and belief. With due concern for the constitutional rights of the defendant, and in recognition of the relative ease with which the government could obtain such information, the court ordered the government to produce non-confidential information to enable a comparative analysis between Puerto Rico and mainland prosecutions.

■ Even if we were to indulge the generous assumption that there was a statistical disparity in the relative incidence of Puerto Rico and mainland prosecutions, we would conclude that the government presented sufficient countervailing reasons of a non-discriminatory nature, *see Saade*, 652 F.2d at 1135; particularly, the disproportionate cash deposit surpluses detected on the part of Puerto Rico (and Florida) banks, which provided a sufficient, non-discriminatory basis for "Operation Greenback."

The assertion that defendant was more severely treated than similarly-situated *mainland* bank officers is based entirely on the unsupported conclusion that the defendant's conduct somehow did not warrant criminal prosecution. The record demonstrates otherwise.

Our review substantiates that the defendant was selected for prosecution utterly without regard to considerations of residency or ethnicity, after a random analysis of Federal Reserve deposits disclosed reason to suspect, and subsequent investigation confirmed, that not all Puerto Rico banks were complying with the currency transaction reporting requirements of federal law. When some of those Puerto Rico banks were caught in the prosecutorial net, simple demographics ordained that Puerto Rico bankers of Hispanic descent would be snared as well. Thus, it is of no legal significance whether defendant was considered especially deserving of exemplary prosecutorial action in the interest of deterring other bankers, in Puerto Rico and elsewhere, from similar disregard of the currency transaction reporting requirements of federal law.

The selective prosecution claim fails.

## (2) *Outrageous Governmental Conduct*

■ The defendant contends that the undercover investigation amounted to outrageous governmental involvement in the Bank's criminal activities. The defendant claims that the government already possessed enough evidence to convict him on at least twenty-five charges, before the undercover operation began. The defendant struggles to conform this curious claim to the familiar refrain that the government's " 'generation ... of new crimes merely for the sake of pressing criminal charges against the defendant' " contravenes due process. *United States v. Bogart*, 783 F.2d 1428, 1436 (9th Cir.1986) (quoting *United States v. Ramirez*, 710 F.2d 535, 539 (9th Cir.1983)), *vacated in part on other grounds sub nom. United States v. Wingender*, 790 F.2d 802 (9th Cir.1986).

Of course *Bogart* recognizes that the government "may approach people already engaged in or contemplating criminal activity [and may] use 'artifice and stratagem to ferret out criminal activity.' " *Id.* at 1438

(quoting *Sorrells v. United States*, 287 U.S. 435, 441, 53 S.Ct. 210, 212, 77 L.Ed. 413 (1932)). Moreover, *Bogart* goes on to intone what is, for the defendant, a very dull note: "the numerous cases *refusing* to apply the outrageous conduct defense invariably conclude that when the government conduct occurred the defendant was involved in a continuing series of similar crimes, or that the charged criminal enterprise was already in progress at the time the government agent became involved." *Id.* at 1437 (emphasis in original).[1] Summarizing, the Ninth Circuit noted that

> law enforcement conduct becomes constitutionally unacceptable when it "shocks the conscience." These [sic] will include situations where the police conduct involved unwarranted physical, or perhaps mental, coercion. However, also constitutionally unacceptable are those hopefully few cases where the crime is fabricated *entirely* by the police [in order] to secure the defendant's conviction rather than to protect the public from the defendant's continuing criminal behavior.

*Id.* at 1438 (emphasis in original); *see also United States v. Russell*, 411 U.S. 423, 432, 93 S.Ct. 1637, 1643, 36 L.Ed.2d 366 (1973). More suitable lyrics were seldom spoken.

There was nothing remotely resembling outrageous governmental conduct in the present case.[2] Years before the government's undercover operatives came on the scene, the defendant was engaged in criminal conduct similar in all material respects to the violations committed in the course of the undercover operation. Nor did the government fabricate the entire crime; far from it, the defendant ran the show.[3]

### (3) Legal Sufficiency of Conspiracy Charge

 An indictment is legally sufficient if it "contains the elements of the offense charged[,] ... fairly informs [the] defendant of the charge against which he must defend, and ... enables him to plead an acquittal or conviction in bar of prosecution for the same offense." *Hamling v. United States*, 418 U.S. 87, 117, 94 S.Ct. 2887, 2907, 41 L.Ed.2d 590 (1974); *accord Russell v. United States*, 369 U.S. 749, 763–64, 82 S.Ct. 1038, 1046–47, 8 L.Ed.2d 240 (1962); *United States v. Indorato*, 628 F.2d 711, 719 (1st Cir.) *cert. denied*, 449 U.S. 1016, 101 S.Ct. 578, 66 L.Ed.2d 476 (1980); *see also* Fed.R.Crim.P. 7(c)(1) (The indictment "shall be a plain, concise and definite written statement of the essential facts constituting the offense charged...."). "An indictment is generally sufficient if it sets forth the offense in the words of the statute including all the elements."[4] *United States v. Holmes*, 632

---

1. We have recognized "outrageous governmental conduct" as a valid defense, without ever having seen one. *See United States v. Michaud*, 860 F.2d 495, 498–99 (1st Cir.1988) (IRS examiner failed to warn defendant that contribution not deductible); *United States v. Bradley*, 820 F.2d 3, 7 (1st Cir.1987) (informant instructed defendant to obtain drugs for agent); *United States v. Porter*, 764 F.2d 1, 8 (1st Cir.1985) *cert. denied*, 481 U.S. 1048, 107 S.Ct. 2178, 95 L.Ed.2d 835 (1987) (government encouraged defendant's criminal conduct); *United States v. Rodriguez–Ramos*, 704 F.2d 17, 22–23 (1st Cir.) (conspiracy instigated by law enforcement agents), *cert. denied*, 463 U.S. 1209, 103 S.Ct. 3542, 77 L.Ed.2d 1391 (1983); *United States v. Parisi*, 674 F.2d 126, 127 (1st Cir.1982) (government supplied food stamps to defendant charged with unauthorized acquisition of food stamps); *United States v. Caron*, 615 F.2d 920, 921 (1st Cir.1980) (evidence belied "outrageous involvement" claim based on alleged badgering of defendant to commit crime).

2. Defendant incorrectly assumes that the sole purpose of the undercover operation was to secure additional convictions against him. An additional aim of the undercover investigation of the Bank was to ferret out other money laundering institutions. Indeed, the Fenner undercover operation led to an investigation of a Grand Cayman bank. Furthermore, the undercover operation disclosed the *modus operandi* employed by defendant in earlier violations.

3. For instance, the record reveals that the government informant, Fenner, never suggested that the Bank not file CTR's. The audiotape evidence of the Fenner undercover operation amounted to little more than the evidential icing on a well-baked cake using defendant's own criminal recipe.

4. Defendant relies on *United States v. Murphy*, 762 F.2d 1151 (1st Cir.1985), where we dismissed an indictment for failure to identify the particular proceedings in which the defendants allegedly influenced the testimony of a witness.

F.2d 167, 169 (1st Cir.1980); *accord United States v. Fusaro*, 708 F.2d 17, 23 (1st Cir.), *cert. denied*, 464 U.S. 1007, 104 S.Ct. 524, 78 L.Ed.2d 708 (1983).

■ A criminal conspiracy is a tacit or explicit agreement to perform an unlawful act or omit one the law requires. *Iannelli v. United States*, 420 U.S. 770, 777, 95 S.Ct. 1284, 1287, 43 L.Ed.2d 616 (1975).

■ Count I alleges a criminal conspiracy under 18 U.S.C. § 371 by charging that the defendant "did intentionally, willfully and knowingly conspire, combine, confederate and agree:" to defraud the United States by impairing the collection of data and currency transaction reports; to violate federal statutes proscribing fraudulent entries in bank records; and to violate federal statutes requiring the filing of CTR's. Count I alleges the unlawful objects of the conspiracy, its approximate temporal span, and most of the means employed for its implementation. It sets out four overt acts, including a meeting of the defendant, co-conspirator Melendez, and agent Ramirez, and it incorporates by express reference, as other overt acts in furtherance of the conspiracy, *see* Fed.R.Crim.P. 7(c)(1), all thirty-four substantive counts in the indictment.[5]

The conspiracy charge was sufficient to enable defendant to defend and to avoid

double jeopardy. *Cf. Hamling*, 418 U.S. at 117, 94 S.Ct. at 2907.

*(4) Sufficiency of Evidence*

We determine the sufficiency of the evidence by viewing it, together with all reasonable inferences drawn from it, in the light most favorable to the government, *see Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942), to see if each element of the crime was established beyond reasonable doubt. *United States v. Drougas*, 748 F.2d 8, 15 (1st Cir. 1984); *United States v. Patterson*, 644 F.2d 890, 893 (1st Cir.1981); *United States v. Mora*, 598 F.2d 682, 683 (1st Cir.1979). *See United States v. St. Michael's Credit Union*, 880 F.2d 579 (1st Cir.1989) ("[T]he prosecut[ion] need only produce that quantum of evidence [on] which a reasonable trier of fact *could* find guilt beyond a reasonable doubt; there is no requirement to produce evidence that would *compel* a finding of guilt beyond a reasonable doubt.") (emphasis in original) (quoting *United States v. McNatt*, 813 F.2d 499, 502 (1st Cir.1987).

(i) Evidence of Conspiracy

■ The unlawful agreement to disobey or disregard the law may be express or

---

Since it could not be discerned from the *Murphy* indictment which proceeding the grand jury had in mind when it indicted, we concluded that "[w]here guilt depends so crucially upon such a specific identification of fact ... an indictment must do more than simply repeat the language of the criminal statute." *Id.* at 1154–55 (quoting *Russell v. United States*, 369 U.S. 749, 764, 82 S.Ct. 1038, 1047, 8 L.Ed.2d 240). *See also Russell*, 369 U.S. at 764, 82 S.Ct. at 1047 (indictment dismissed for failure to specify "subject under inquiry," where "core of criminality [was the] pertinency to the subject under inquiry of the questions which the defendant refused to answer....."). *Murphy* and *Russell* are inapposite. The present indictment alleges with great particularity, over the course of thirty-four pages, the nature of the conduct "at the core of criminality," the nature of the unlawful agreement to defraud the United States and violate federal banking laws, and the praxis employed to those ends.

5. Defendant faults count I for failure to name all co-conspirators. It is settled law that "the identity of the other members of the conspiracy

is not needed, inasmuch as one person can be convicted of conspiring with persons whose names are unknown." *Rogers v. United States*, 340 U.S. 367, 375, 71 S.Ct. 438, 445, 95 L.Ed. 344 (1951); *United States v. Rivera Diaz*, 538 F.2d 461, 465 (1st Cir.1976) (conviction survives acquittal of named co-conspirators where indictment refers to unnamed co-conspirators as well). Where, as here, the indictment alleges the unlawful agreement with sufficient particularity, the defendant is not denied adequate notice of the charge merely by virtue of the failure to name all co-conspirators. *Indorato*, 628 F.2d at 717–18 (alleging that defendant conspired with "diverse persons whose names to the Grand Jury are presently unknown"). *See also United States v. Piccolo*, 723 F.2d 1234, 1239 (6th Cir.1983) *(en banc), cert. denied*, 466 U.S. 970, 104 S.Ct. 2342, 80 L.Ed.2d 817 (1984); *United States v. Davis*, 679 F.2d 845, 851 (11th Cir. 1982), *cert. denied sub nom. Armstrong v. United States*, 459 U.S. 1207, 103 S.Ct. 1198, 75 L.Ed.2d 441 (1983).

tacit, *United States v. Rivera–Santiago,* 872 F.2d 1073, 1079 (1st Cir.1989), as directly evidenced by actions taken and words spoken in its furtherance, *United States v. Glenn,* 828 F.2d 855, 857 (1st Cir.1987); *Rivera–Santiago,* 872 F.2d at 1079, and as reasonably inferred from the circumstances established by the evidence, *United States v. Peters,* 732 F.2d 1004, 1006–07 (1st Cir. 1984); *Rivera–Santiago,* 872 F.2d at 1079; *Patterson,* 644 F.2d at 893, which must establish defendant's specific intent to combine with one or more similarly-minded participants to further their criminal venture, *Rivera–Santiago,* 872 F.2d at 1079; ("government must prove two kinds of intent: intent to agree and intent to commit the substantive offense."); *accord United States v. Flaherty,* 668 F.2d 566, 580 (1st Cir.1981); *Drougas,* 748 F.2d at 15.

■■■ The record belies the contention that the defendant did not participate in a common plan with any person other than Melendez.[6] There was ample evidence from which the jury reasonably could have found beyond a reasonable doubt that Melendez and other participants in transactions[7] forming the bases for various substantive counts acted in concert with the defendant to effect their common purpose. There was evidence that defendant and Melendez willfully disregarded federal legal requirements that the Bank submit a CTR for each currency transaction in excess of $10,000. For instance, as early as 1977, bank examiners noticed a large number of cash deposits for which the Bank issued negotiable bearer certificates to the depositors. Defendant theorized to bank examiners that the bearer certificates were popular because the Bank was exempt from the reporting requirements. The Federal Home Loan Bank Board promptly informed the defendant that the Bank did have to file a CTR for any cash purchase of a bearer certificate over $10,000. In 1978, 1981, and 1982 the defendant reassured examiners that the Bank was filing a CTR for each currency transaction in excess of $10,000.

The evidence revealed that the defendant and Melendez jointly "structured" many currency transactions to conceal their reportable nature. For instance, in effecting one particular "undercover" transaction defendant made out a false deposit slip, Melendez procured the certificate of deposit, and defendant signed it. In another transaction, defendant and Melendez met initially with the undercover agent, and explained that henceforth Melendez would attend to the details of further transactions, which he did. In yet other transactions, the defendant and Melendez jointly sold and issued certificates of deposit. Melendez often was present when the cash was counted, and he frequently falsified deposit slips and made false entries in the Bank's register of certificates of deposit. Significantly, the methods used by Melendez in implementing these transactions were shown to be virtually identical to those used by the defendant.

The conspiracy charge against defendant was proven beyond a reasonable doubt, many times over.

### (ii) Evidence of Substantive Crimes

In tandem with the argument for overturning his conspiracy conviction, defendant urges us to vacate all substantive convictions exclusively predicated on *Pinkerton* liability (counts IX, X, XV, XIX, XXI,

---

**6.** Contrary to defendant's resourceful assertion that Melendez was merely a subordinate Bank employee carrying out the *Bank's* "established policy" of not filing CTR's, and thus could not have "agreed" to further the purposes of the conspiracy, the jury reasonably could have concluded that Melendez was a full-fledged co-conspirator knowingly acting of his own free accord. *See United States v. Martorano,* 557 F.2d 1, 8 (1st Cir.1977), *cert. denied,* 435 U.S. 922, 98 S.Ct. 1484, 55 L.Ed.2d 515 (1978) (evidence showed that co-conspirator was "not simply defendant's errand boy, but that he was privy to terms of [extortionate] extension of credit").

**7.** There was testimony from which the jury reasonably could have inferred that Bank vice president Calderon, several Bank depositors, and the defendant, knowingly and willfully, combined to cause, and conceal, the Bank's failure to file CTR's.

XXII, XXIII, XXIV, XXV).[8] We need not address this claim, however, since defendant's own criminal conduct was sufficient to establish guilt, beyond a reasonable doubt, under each substantive count except counts XIX and XXII. As to substantive counts XIX and XXII (and many others as well), an abundance of evidence established defendant's vicarious responsibility as a co-conspirator under *Pinkerton.*

### (5) *Duty to File CTR's*

The defendant contends that the judgment of conviction is predicated on erroneous interpretations of the Currency and Foreign Transactions Reporting Act (Act), Title II of the so-called Bank Secrecy Act of 1970, Act of Oct. 26, 1970, Pub.L. No. 91–508, Title II, 84 Stat. 1118, 1118–22.[9] First, defendant contends, to no avail, that he was not a "financial institution;" second, that certain currency transactions with "established depositors" were exempt from the reporting requirements; third, that currency transactions which occurred during the government's undercover operations were exempt.

#### (i) Duty to File

Section 5313 of the Act provides, in relevant part:

(a) When a domestic financial institution is involved in a transaction for the payment, receipt, or transfer of United States coins or currency (or other monetary instruments the Secretary of the Treasury prescribes), in an amount, denomination, or amount and denomination, or under circumstances the Secretary prescribes by regulation, the institution and any other participant in the transaction the Secretary may prescribe shall file a report on the transaction at the time and in the way the Secretary prescribes.

31 U.S.C. § 5313(a). *See also* 31 C.F.R. § 103.22(a)(1) (1986) ("Each financial institution other than a casino shall file a report of each deposit, withdrawal, exchange of currency or other payment or transfer by, through, or to such financial institution, which involves a transaction in currency of more than $10,000.").[10]

The defendant argues that the reporting requirements did not apply to him, but only to the Bank. He relies on our decision in *United States v. Anzalone,* 766 F.2d 676, 681 (1st Cir.1985), which held that the regulations promulgated pursuant to the Act did not clearly impose a legal duty on a bank *customer* to report a currency transaction "structured" to prevent it from exceeding the $10,000 threshold amount which activates the reporting requirement.[11] *Anzalone* and the other authorities relied on by the defendant are inapposite. Defendant was president of the Bank, not a customer. *See United States v. Polychron,* 841 F.2d 833 (8th Cir.1988),

---

**8.** *See Glenn,* 828 F.2d at 859–60. Under *Pinkerton v. United States,* 328 U.S. 640, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946), a defendant is "vicariously liable for the acts of his coconspirators, provided [those] acts were within the scope of the conspiracy, were intended to further the conspiracy, and were reasonably foreseeable as a necessary or natural consequence of the conspiracy." *United States v. Garcia–Rosa,* 876 F.2d 209, 217 n. 3 (1st Cir.1989), *cert. denied sub nom. Alvarez v. United States,* — U.S. —, 110 S.Ct. 742, 107 L.Ed.2d 760 (1990).

**9.** The Act was amended by the Act of Sept. 13, 1982, Pub.L. No. 97–258, 96 Stat. 877, 995–1000, and by the Comprehensive Crime Control Act of 1984, Pub.L. No. 98–473, Title II, Ch. IX, § 901, 98 Stat. 1837, 2135 (codified at 31 U.S.C. §§ 5311, *et seq.*). The 1982 amendments were intended merely to clarify and codify. H.R. Rep. 651, 97th Cong., 2d Sess. 1, 169, *reprinted in* 1982 U.S.Code Cong. & Admin.News 1895,

2063. Later amendments, *see* Anti–Drug Abuse Act of 1986, Pub.L. No. 99–570, 100 Stat. 3207; Anti–Drug Abuse Act of 1988, Pub.L. No. 100–690, 102 Stat. 4181, are not implicated by the present appeal.

**10.** Defendant does not dispute that the Bank is a "financial institution," which includes an insured institution (as defined in section 401(a) of the National Housing Act (12 U.S.C. § 1724(a)), and a thrift institution. 31 U.S.C. § 5312(a)(2)(F). *See also* 12 U.S.C. § 1724; 31 C.F.R. 103.11(a)(4), (5) (1986).

**11.** The Act has been amended to prohibit "any person" from failing to report, or from structuring a currency transaction in order to avoid reporting, a reportable transaction. Anti–Drug Abuse Act of 1986, Pub.L. No. 99–570, § 1364(a), 100 Stat. 3207, 3207–34; 31 U.S.C. § 5324.

*cert. denied,* 488 U.S. 851, 109 S.Ct. 135, 102 L.Ed.2d 107; *United States v. Shannon,* 836 F.2d 1125 (8th Cir.), *cert. denied,* 486 U.S. 1058, 108 S.Ct. 2830, 100 L.Ed.2d 930 (1988).

Moreover, as the district court noted, *United States v. Peñagaricano–Soler,* 646 F.Supp. 75, 77 (D.P.R.1986), the present case does not involve "structured" currency transactions. Each currency transaction alleged in the indictment involved "a physical transfer of currency," 31 C.F.R. § 103.11(1), in excess of $10,000. *See United States v. Bank of New England,* 821 F.2d 844, 851 (1st Cir.1987) (cash transfer above $10,000 triggers reporting requirement).

Furthermore, it does not matter whether the Act or the regulations directly imposed a legal duty upon the defendant to file CTR's, since the evidence established that he knowingly and willfully *aided and abetted* the Bank's disregard of its duty to file CTR's. *See* 18 U.S.C. § 2(b) ("Whoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal."). "The acts of a corporation are, after all, simply the acts of all of its employees operating within the scope of their employment.... [T]he knowledge obtained by corporate employees acting within the scope of their employment is imputed to the corporation." *Bank of New England,* 821 F.2d at 856 (citations omitted).

■ Thus, the Bank's liability as a principal was established by evidence that its president (defendant) and manager (Melendez) knowingly acted with the requisite criminal intent to cause the Bank to disregard its legal duty to file CTR's. The defendant's intentional implementation of the Bank's practice of evading the CTR filing requirements established defendant's criminal liability as an "aider and abettor." *See United States v. Heyman,* 794 F.2d 788, 790–93 (2d Cir.) (where defendant had

no independent duty to file CTR's, section 2(b) put him on notice of criminality of his actions, as aider and abettor of firm's violation of Act: "an individual can be held culpable for causing a third person to commit a criminal act where the defendant lacks the legal capacity to commit the substantive crime."), *cert. denied,* 479 U.S. 989, 107 S.Ct. 585, 93 L.Ed.2d 587 (1986). *United States v. Thompson,* 603 F.2d 1200 (5th Cir.1979) (sustaining conviction of bank chairman for causing bank not to file CTR under earlier version of Act). *Cf. St. Michael's Credit Union,* 880 F.2d 579 (affirming, without comment, conviction of bookkeeper for causing credit union not to file CTR's where section 2(b) liability not at issue).[12]

### (ii) Exemptions

■ The Act empowers the Secretary of the Treasury to prescribe exemptions from the currency transaction reporting requirements, including the following:

[b](2)....

(i) Deposits or withdrawals of currency from an *existing account by an established depositor who* is a United States resident and *operates a retail type of business* in the United States. For the purpose of this subsection, a retail type of business is a business primarily engaged in providing goods to ultimate consumers and for which the business is paid in substantial portion by currency, except that dealerships which provide automobiles, boats, or airplanes are not included and their transactions are not exempt from the reporting requirement of this section.

(ii) Deposits or withdrawals of currency from an existing account by an *established depositor who* is a United States resident and *operates a sports arena, race track, amusement park, bar, restaurant, hotel, check cashing service li-*

---

12. As defendant is liable as an "aider and abettor" we need not address his liability as a principal. We note, however, that the regulations in force during the indictment period stated that a "bank" was a "financial institution," and defined

a "bank" as including an "agent" thereof. *See* 31 C.F.R. § 103.11(a) (1986). More recently, of course, a "financial institution" is defined to include "each *agent,* agency" of the "financial institution." *See* 31 C.F.R. § 103.11 (1989).

*censed by state or local governments, vending machine company, or theater.*

*(iii) Deposits, or withdrawals, exchanges of currency or other payments or transfers by local or state governments, or the United States or any of its agencies or instrumentalities.*

(iv) Withdrawals for payroll purposes from an existing account by *an established depositor who* is a United States resident and operates a firm that *regularly withdraws more than $10,000 in order to pay its employees in currency.* 31 C.F.R. § 103.22(b)(2) (1986) (emphasis added). Thus, a financial institution need not report currency transactions with a *federal, state or local governmental agency or instrumentality,* or currency transactions involving its *existing accounts* with *established depositors* who operate a retail-type business customarily engaging in large currency transactions.[13]

### (a) *Established Depositor Exemption*

The Secretary's regulatory scheme was meant to minimize the reporting burdens imposed on financial institutions and their established customers in regard to legitimate currency transactions customarily conducted in the normal course of a retail-type business which regularly requires, or generates, large amounts of cash or cash equivalents. Congress was not concerned with routine "payroll" withdrawals, or with the end-of-day cash deposits of a sports arena, for instance, but with the accustomed money-laundering transactions which serve as convenient camouflage for concealing transfers of large amounts of currency generated through criminal enterprise. The defendant, on the other hand, would have us exempt the sorts of currency transactions which the Act and the Secretary's regulatory scheme were designed to disclose.

The defendant argues, for instance, that one of the Kindratiw transactions was exempt because Kindratiw was an established depositor, a United States resident, an operator of retail-type businesses, with an "existing account." The contention is spurious. Kindratiw opened the alleged "existing account" on October 28, 1982, by making the very $218,000 deposit which is the subject of count II, the first substantive violation alleged in the indictment.

Two other Kindratiw transactions were conducted in Kindratiw's own name, rather than the name of any of his businesses (all of which did their banking on the mainland). There was no evidence from which one could "reasonably conclude" that these transactions were in "amounts commensurate with the customary conduct of [a] lawful, domestic business ..." 31 C.F.R. § 103.22(c). Indeed, Kindratiw informed defendant that he did not want to use Florida banks because he wished to avoid the CTR filing requirements.

The defendant argues that the Hernandez transaction alleged in count XVIII was exempt. But Hernandez testified that

---

**13.** Nevertheless, each exempt transaction must be *contemporaneously recorded* by the financial institution and must be in an amount which enables the financial institution reasonably to conclude that the transaction is "commensurate with the customary conduct of the ... customer." Paragraphs (c) and (e) of 31 C.F.R. § 103.22 provide:

(c) In each instance the transactions exempted under paragraph (b) of this section must be in amounts which the bank may *reasonably* conclude do not exceed amounts *commensurate with the customary conduct of the lawful, domestic business of that customer,* or in the case of transactions with a local or state government or the United States or any of its agencies or instrumentalities, in amounts which are *customary and commensurate with the authorized activities of the agency or instrumentality....*

(e) *A record of each exemption* granted under paragraph (b) of this section and the reason therefor *must be made at the time it is granted* and all such exemptions *must be kept* in a centralized list. The record shall include the ... name, address, business, taxpayer identification number, and account number of each depositor that has engaged in currency transactions which have not been reported because of the exemption provided in paragraph (b)(2) of this section. The record concerning the group of depositors exempted under the provisions of paragraph (b)(2) of this section should also indicate whether the exemption covers withdrawals, deposits, or both, as well as the dollar limit of the exemption.

31 C.F.R. § 103.22(c), (e) (1986) (emphasis added).

"Antilles Carpet" involved a "minimal amount of cash." Thus, "Antilles Carpet" was not a retail-type business. *See id.* § 103.22(b)(2)(i), (ii).

■ Finally, defendant claims that the Matos Garcia transaction in count XXXIV was exempt, but neither Garcia nor his restaurant had an account with the Bank. That the restaurant borrowed money from the Bank in the past neither made it a "depositor" nor satisfied the "existing account" requirement.[14]

### (b) *"Government Transaction" Exemption*

■ The defendant argues that the undercover transactions conducted by federal agents Adams and Ramirez came within the "government transaction" exemption, as currency deposits "by ... the United States or any of its agencies or instrumentalities." *Id.* § 103.22(b)(2)(iii).

Similar contentions have been accorded deservedly short shrift by other courts. In *United States v. Richter*, 610 F.Supp. 480 (N.D.Ill.1985), *aff'd sub nom. United States v. Mangovski*, 785 F.2d 312 (7th Cir.1986), defendants "structured" deposits of cash received from undercover agents. Although the district court found that the government held title to the funds deposited, it ruled that the deposits were not made "by government agencies in the normal course of government business," but by private parties (defendants) who believed the funds were private. *Richter*, 610 F.Supp. at 490–91; *see also United States v. Bucey*, 691 F.Supp. 1077, 1087 (N.D.Ill. 1988), *rev'd on other grounds*, 876 F.2d 1297 (7th Cir.1989) (exemption not applicable in "situation where an individual deposited government funds in the erroneous belief they came from a private individual").

The Eleventh Circuit rebuffed a similar contention in *United States v. Hernando Ospina*, 798 F.2d 1570 (11th Cir.1986) (section 1001 violation), where undercover agents received $250,000 in cash from the defendants, brought it to a bank, identified themselves as government agents, and purchased cashier's checks. The bank did not file a CTR. The Eleventh Circuit concluded that the bank had a duty to file.

> What is crucial is that if the appellants had personally conducted the transactions on their own behalf, [the bank] would certainly have had a duty to report the transactions. That the agents did so on behalf of [defendants], and with the [defendant's] money, does not convert these transactions into transactions by the government as part of its day-to-day operations.

*Id.* at 1580.

An otherwise reportable currency transaction cannot qualify for exemption from the reporting requirements under 31 C.F.R. § 103.22(b)(2)(iii), unless, at a minimum, the financial institution possesses actual and contemporaneous knowledge that the currency transaction is being conducted "with ... [the] government[ ]," 31 C.F.R. § 103.22(c). Without such knowledge it simply is not possible for the financial institution to "reasonably conclude" that the transaction is "with a local or state government or the United States," 31 C.F.R. § 103.22(c), much less that the transaction amount was "customary and commensurate with the authorized activities of the agency or instrumentality," *id.*

### (6) *Juror Bias*

■ During voir dire the court twice put the following question to the venire: "Do you or does any member of your family have any dealings or transactions with the United States government or any of the federal agencies or with [defendant] from which you might profit, from which you might benefit?" Although Juror 35 was receiving social security disability benefits at the time, she did not respond. Upon learning of this, defendant moved for a new trial. The district court carefully in-

---

**14.** Furthermore, it is noteworthy that the Garcia and the Hernandez transactions involved purchases of certificates of deposit. Although we do not now decide the issue, it is by no means clear that the purchase of a certificate of deposit is exempt from the reporting requirement under the "existing account" provision.

quired into the charge of juror bias, then denied the motion for new trial.

The district court's inquiry in the present case was entirely adequate. The district court has broad discretion to "determine the extent and nature of its inquiry into allegations of juror bias," *United States v. Corbin*, 590 F.2d 398, 400 (1st Cir.1979) (citing cases), unless the suggestion of bias is frivolous, in which event no inquiry is necessary, *id.*

The court's inquiry on voir dire left prospective jurors free to determine whether a government verdict or a defense verdict would "benefit" them. Even if receipt of social security disability benefits constitutes a "dealing or transaction" with the government, it was eminently sensible for Juror 35 to conclude that her social security benefits would not be affected whether the government won or lost.

The claim of bias was frivolous, resting on nothing more than the bald assumption that any recipient of social security disability benefits must be disqualified from federal jury service in a criminal case. The presumed detrimental effect upon a defendant's entitlement to an unbiased jury must be consigned to the realm of the fanciful, absent some indication that the outcome of the criminal case conceivably could affect, or be seen by Juror 35 as somehow affecting, her social security benefits.

### (7) *Adequacy of Jury Deliberations*

■ The defendant insists that the jury did not deliberate long enough to consider all of the evidence in this "complex" case.[15] Defendant points out that the trial lasted five weeks; involved over three hundred exhibits and fifty-one government witnesses; thirty-two counts went to the jury, including the conspiracy count; yet the jury deliberated a mere four hours. The defendant argues that the jury must have taken a "mechanistic" approach to its analysis of the voluminous evidence, before rendering a "blanket conviction" on all counts.

The factual issues were not unusually complex, and the evidence was not especially voluminous. Most of the documentary evidence consisted of deposit slips and certificates of deposit, generally differing only as to date and amount. The conspiracy count presented some challenge, but though the jury twice requested further instructions there is no indication that it did not understand its charge or the evidence. The thirty-one substantive counts presented straightforward jury issues.

We are not impressed with the suggestion that any injustice resulted from the jury's failure to deliberate more than four hours. Instead, "[f]rom our study of the record we can well understand why the jury took no longer in coming to a decision." *Wall*, 384 F.2d at 762.

### (8) *Imposition of Fines*

■ The defendant contends that the district court erred by failing to make the specific findings mandated by statute before imposing fines totalling $555,000.[16] We have never been required to address the precise issue raised by the defendant. Moreover, our sister circuits are not of one

---

15. The cases cited by defendant evaluate various *Allen* ("dynamite") charges to deadlocked juries. Of course, no rule requires a jury to deliberate for any set length of time. *See, e.g., United States v. Anderson*, 561 F.2d 1301, 1303 (9th Cir.) (per curiam) ("brief deliberation"), *cert. denied*, 434 U.S. 943, 98 S.Ct. 438, 54 L.Ed.2d 304 (1977); *United States v. Brotherton*, 427 F.2d 1286, 1289 (8th Cir.1970) (five to seven minutes); *Wall v. United States*, 384 F.2d 758, 762 (10th Cir.1967) (one hour); *Kimes v. United States*, 242 F.2d 99, 100–01 (5th Cir.) (twenty minutes) (order denying rehearing), *cert. denied*, 354 U.S. 912, 77 S.Ct. 1299, 1 L.Ed.2d 1429 (1957).

16. Title 18, United States Code, section 3622(a) provides in relevant part:

> *In determining whether to impose a fine and the amount of a fine, the court shall consider,* in addition to other relevant factors—
> ....
> (3) the *defendant's income, earning capacity, and financial resources;*
> (4) the *burden that the fine will impose upon the defendant, any person who is financially dependent on the defendant ...;*
> (5) *any pecuniary loss inflicted upon others as a result of the offense;*
> ....
> (7) *the need to deprive the defendant of illegally obtained gains from the offense;*
> 18 U.S.C. § 3622(a) (emphasis added).

mind on the matter.[17]

We need not now determine whether it is an abuse of discretion to impose a fine absent any findings on the relevant factors delineated in the statute. It is enough to note that it does not appear from the present record that the district court had before it sufficient information to warrant the imposition of these fines under the relevant statutory criteria. *See Weir*, 861 F.2d at 545; *Condon*, 816 F.2d at 436. Thus, we can only speculate as to what prompted the imposition of these fines and whether and how the court balanced the relevant statutory factors.[18] As effective appellate review is impracticable on the present record, we must remand for resentencing.

*The judgment of conviction is affirmed. The sentence is set aside insofar as it imposes fines. The case is remanded for resentencing. On remand, the district court shall articulate the factors considered in determining to impose fines and the amounts thereof.*

---

17. *United States v. Weir*, 861 F.2d 542 (9th Cir. 1988), *cert. denied*, —— U.S. ——, 109 S.Ct. 1555, 103 L.Ed.2d 858 (1989), held that section 3622(a), notwithstanding its mandatory nature, does not require the court to make written or oral findings regarding the listed factors. "There is no abuse of discretion when the *court had before it information bearing on all the relevant factors*, including facts necessary to consider imposition of a substantial fine, absent a record showing the court refused to consider the section 3622(a) factors." *Id.* at 545 (emphasis added). *Cf. United States v. Condon*, 816 F.2d 434, 436 (8th Cir.1987) (cited in *Weir* ) ("In light of *the available information* and absent a record showing that the district court refused to consider the § 3622(a) factors, [we decline to] find the sentence to be an abuse of discretion.") (emphasis added). A divided Fourth Circuit panel recently expressed a contrary view in *United States v. Harvey*, 885 F.2d 181, 183 (4th Cir.1989) ("*specific findings* with regard to the listed factors" are "*essential* to effective appellate review of the fines....") (emphasis added). The Fourth Circuit remanded with instructions.

18. The present record reveals that the defendant comes from an "upper middle income" background. He is a forty-eight year old married man with three children, two of whom are in school. He is in fair health. Although defendant was a founder of the Bank, the highest salary he has earned was $62,000. Since resigning that position, defendant has been self-employed as a financial consultant with average monthly income of $6,294, fixed monthly expenses of $5,250, and net disposable income of $1,044 per month. His apparent net worth is $146,849, including equity in what is described as an "opulently adorned three-bedroom home situated in a panoramic rural setting." There is a $250,000 mortgage lien on the residence, which secures five $50,000 bearer notes. The report implies that the defendant holds these bearer notes and that he can readily convert them to cash. There is evidence that the defendant, near the time of trial, transferred to his children shares of stock in a real estate holding corporation which owns a Vermont property bought for $115,000 and encumbered in the amount of $35,000.