**UNITED STATES**

v.

**Richard GOLDBERG.**

**Crim. A. No. 95–10223.**

United States District Court,
D. Massachusetts.

Nov. 22, 1995.

---

**60**

Morris M. Goldings, David R. Kerrigan, Mahoney, Hawkes & Goldings, Boston, MA, for Richard D. Goldberg.

Michael Kendall, U.S. Attorney's Office, Boston, MA, for U.S.

## MEMORANDUM AND ORDER

LINDSAY, District Judge.

The defendant, Richard Goldberg, moves to dismiss the indictment against him on the ground that he has been selectively prosecuted for exercising his constitutional right to petition the government for redress of grievances. He argues interchangeably for dismissal and for an evidentiary hearing on the issue of selective prosecution. For the reasons set forth below, the motion is DENIED.

### I. Relevant Facts

In July of this year, a federal grand jury indicted Goldberg on various charges (including mail fraud, wire fraud, and conspiracy) in connection with what the government contends was the provision of illegal gratuities to members of the Massachusetts Legislature.[1] In particular, Goldberg is charged with having improperly allowed Charles Flaherty, then the House Majority leader and now the House Speaker, to use a vacation house Goldberg had rented in Cotuit, on Cape Cod, Massachusetts. The government alleges that Goldberg attempted to influence Flaherty improperly in connection with Goldberg's efforts to get favorable treatment by the Legislature with respect to certain property Goldberg owned. Goldberg is the owner of a valuable off-site parking lot at Boston's Logan Airport. During the period covered by the investigation that resulted in this indictment, the Commonwealth of Massachusetts was considering taking the lot by eminent domain for use in a major highway construction program called the Central Artery/Third Harbor Tunnel Project. Goldberg was allegedly seeking to influence the Massachusetts Legislature to approve an alternate route for the construction that would not require taking his property, or to influence the Legislature to approve better terms and compensation for the taking of his property than he could have received in the eminent domain procedure.

Before proceeding further, it is necessary briefly to acknowledge two factual disputes between Goldberg and the government.

The first concerns Michael Kendall, one of the Assistant U.S. Attorneys prosecuting this case. Kendall worked for the administration of Massachusetts Governor Michael S. Dukakis for three summers while he was in college (1976–78). Goldberg contends that, during a pretrial meeting attended by the representatives of the U.S. Attorney's office (Joseph Savage, Jonathan Chiel, Michael Kendall, and Kevin Cloherty, Assistant U.S. Attorneys), Kendall commented, " 'I know all about [Goldberg's] battle with [Frederick] Salvucci [the former Secretary of Transportation for Massachusetts]. I worked in the Dukakis administration.' " Affidavit of Richard Goldberg ("Goldberg Affidavit") at ¶ 12. Goldberg also contends that Kendall remarked that the "problem" with Goldberg was that he was rich and stubborn, and that he "never should have won the fight with Salvucci." Affidavit of Morris Goldings ("Goldings Affidavit") at ¶ 4. Goldberg con-

---

1. Specifically, Goldberg is charged with violating the following statutes: 18 U.S.C. §§ 2, 371, 1341, 1343, 1346, and 1952.

tends that these comments show that Kendall is biased and is prosecuting him because of impermissible personal or political motives.

The government attendees at the meeting—Savage, Chiel, Kendall and Cloherty—have submitted counter-affidavits in which they swear that Kendall never said the things attributed to him by the Goldings and Goldberg affidavits. Furthermore, the government contends, in its Opposition to the Motion to Dismiss, that Kendall "has no memory of meeting Frederick Salvucci or David Davis" [former Executive Director of the Massachusetts Port Authority ("Massport") ] before August, 1993. Government's Motion in Opposition to Motion to Dismiss the Indictment at 7.[2]

The second disputed fact has to do with files produced by the U.S. Attorney's office during discovery. Some of these files bear the initials, "DD." Goldberg contends that this shows that the source of these files is David Davis. Thus he argues that, because Massport has supplied the documents to the government, there is evidence of bias against him. In response, the government argues that the initials "DD" refer not to Davis, but to Special Agent Denise Doherty, an agent of the Federal Bureau of Investigation assigned to the investigation.

■ As to the issue of what Kendall said at meeting, the court finds that, even if the remarks attributed to him by Goldberg were made, they do not by themselves establish such bias on the part of Kendall as would result in his singling out of Goldberg for prosecution. Moreover, Goldberg has not shown that even if Kendall were so biased, that bias infected others involved in the decision to prosecute.

■ As for the files bearing the initials "DD," the record contains the affidavit of Goldberg's counsel in which counsel states that "[u]pon closer examination of [a file containing press articles about Goldberg], I saw that the articles had been sent from David Davis ..." The affidavit does not explain how counsel surmised that the articles were sent from Davis. But no matter, for even if the files had come from Davis, they fall far short of establishing a politically-motivated or otherwise impermissibly biased prosecution of Goldberg. Apparently, the court is invited to infer that former Transportation Secretary Salvucci was determined sometime in the late 1970's or early 1980's "to get" Goldberg because of his opposition to the design of the Central Artery/Third Harbor Tunnel Project. That virulent animus was transmitted to Davis (or Davis independently developed the animus). *See* Goldberg Affidavit at ¶¶ 4, 8. The animus was then transmitted to the U.S. Attorney and his assistants who secured the indictment of Goldberg in 1995. Goldberg's invitation is to indulge in fanciful speculation; it is an invitation which should be, and is, refused.

The court now turns to the main thrust of Goldberg's motion.

## II. Analysis: Standard for Dismissing an Indictment/Selective Prosecution

■ The ultimate relief Goldberg seeks—dismissal of the indictment—is granted only in extreme circumstances. There is a strong presumption in favor of the regularity of a prosecutor's decision to indict. "[T]he courts should presume that [a] prosecution was pursued in good faith execution of the law." *United States v. Bassford*, 812 F.2d 16, 19 (1st Cir.1987), *cert. denied* 481 U.S. 1022, 107 S.Ct. 1909, 95 L.Ed.2d 514, *citing Tracey v. United States*, 739 F.2d 679, 682 (1st Cir. 1984), *cert. denied*, 469 U.S. 1109, 105 S.Ct. 787, 83 L.Ed.2d 781 (1985). "So long as the prosecutor has probable cause to believe that the accused committed an offense defined by statute, the decision whether or not to prosecute, and what charge to file or bring before a grand jury, generally rests entirely in his discretion." *Wayte v. United States*, 470 U.S. 598, 607, 105 S.Ct. 1524, 1530, 84 L.Ed.2d 547 (1985), *quoting Bordenkircher v.*

---

**2.** Although this contention appears in the government's motion in opposition, Kendall does not swear to it in his affidavit. Perhaps this is because Kendall's affidavit addresses statements made at the meeting, and only those statements. In any case, the court finds the omission inconsequential, in light of the court's view as to the significance of any statements made by Kendall at the meeting.

*Hayes,* 434 U.S. 357, 98 S.Ct. 663, 54 L.Ed.2d 604 (1978). The Supreme Court has explained this presumption of prosecutorial correctness in the following terms:

> This broad discretion rests largely on the recognition that the decision to prosecute is particularly ill-suited to judicial review. Such factors as the strength of the case, the prosecution's general deterrence value, the Government's enforcement priorities, and the case's relationship to the Government's overall enforcement plan are not readily susceptible to the kind of analysis the courts are competent to undertake.

*Wayte,* 470 U.S. at 607, 105 S.Ct. at 1530.

■ This prosecutorial discretion is not unfettered, however. *Id.* at 608, 105 S.Ct. at 1530. A defendant may overcome the threshold presumption of good-faith action by making a prima facie demonstration of "intentional and purposeful discrimination." *Bassford,* 812 F.2d at 19. To make this showing, the defendant must establish

> (1) that, while others similarly situated have not generally been proceeded against because of conduct of the type forming the basis of the charge against him, he has been singled out for prosecution, and (2) that the government's discriminatory selection of him for prosecution has been invidious or in bad faith, i.e., based upon such impermissible considerations as race, religion, or the desire to prevent his exercise of constitutional rights.

*United States v. Penagaricano–Soler,* 911 F.2d 833, 837 (1st Cir.1990), *quoting United States v. Union Nacional de Trabajadores,* 576 F.2d 388, 195 (1st Cir.1978) (citation omitted).

Thus, there are two inquiries involved in the test for selective prosecution. The court will address these two inquiries in turn.

### A. First Part: Singled Out for Prosecution

Goldberg's argument that he meets the first prong of this test is that

> others similarly situated were not prosecuted[,] including the lobbyist and the 'one or more' state legislators as [sic] they are the individuals referred to in the Indict-

ment who allegedly violated the state ethics laws. They, not the Defendant, are the ones who should be at all familiar with those laws. Instead of proceeding against the alleged active wrongdoers, however, the Government elected to proceed against Mr. Goldberg on some nebulous theory that he 'assisted' in these violations of state ethic [sic] laws which give rise to the mail and wire fraud statutory violations.

Memorandum in Support of Motion to Dismiss Indictment at 9.

The First Circuit case that provides the most helpful insights into the resolution of the claim made by the defendant is *United States v. Saade,* 652 F.2d 1126 (1st Cir.1981). In that case, a group of fishermen staged a "float-in" in protest of the U.S. Navy's using Vieques (one of the smaller islands that are part of Puerto Rico) for target practice. A "flotilla of small boats carrying approximately thirty-five people" congregated directly off-shore from a "ship-to-shore land target" during target practice one morning. The area was closed to boat traffic pursuant to the Code of Federal Regulations. The boaters refused to leave, despite directions to do so. The Navy later arrested two of the participants, Saade and Zenon. Zenon was "a prominent president of the Vieques Fishermen's Association and active in the movement opposed to the use of Vieques as a Navy training area," while Saade was "the attorney for both Zenon and the Association and also actively participate[d] in the opposition to the Navy's activities on Vieques." Saade and Zenon were the only people arrested and prosecuted. They contended that their prominence had influenced the government's decision to arrest and prosecute them.

In response, the government contended that "only [Saade and Zenon] could be identified without the Government undertaking an extensive investigation." *Id.* at 1136. In the First Circuit's analysis,

> Saade's allegations suggest a striking coincidence that arguably casts a reasonable doubt on the propriety of the Government's design in pursuing the prosecution of the appellants only, thus warranting an evidentiary hearing. But the Government parried these allegations with concrete, le-

gitimate reasons that were subsequently supported in full by evidence adduced at the trial. The district court also may have considered that the Government, in an effort to husband its limited prosecutorial resources, chose to prosecute only those who could be easily apprehended in the hope that prosecution of the appellants would deter future illegal disruptions of Navy training practice.

*Id.* Despite the circumstances of this prosecution, the Court of Appeals determined the defendants had not been singled out.

■ As the government did in *Saade*, it has explained in this case why it has directed its prosecutorial fire at a particular person; and that explanation is persuasive. It appears from the representations made by the government in its motions and affidavits, that the "lobbyist" mentioned in the indictment has been immunized by the government, so that he will testify against Goldberg and other defendants, a step the government contends—and the court agrees—is rational. As for the other participants in the Cotuit home rental, the government contends that "the investigation is ongoing," and that "unlike [them], Goldberg refused to extend the statute of limitations on potential charges concerning the renting and use of the home." The government thus has "parried [Goldberg's] allegations with concrete, legitimate reasons" justifying its prosecution of him, while leaving, (for the time being, at least) others involved in the same or similar alleged wrongdoing uncharged. Accordingly, the government has adequately explained the reasoning behind its thus far singular prosecution of Goldberg. Goldberg, therefore, fails to meet the first prong of the test for selective prosecution.

### B. Second Part: Bad Faith/Invidious Purpose

Having found that Goldberg's claim fails the first prong of the test for selective prosecution, the court need not address his argument under the second prong of the test. Goldberg advances his argument avidly, however, and the court disagrees with that argument. Thus, it seems appropriate to explain the court's reasoning.

■ The second prong of the test for selective prosecution is proof that "the government's discriminatory selection of [the defendant] for prosecution has been invidious or in bad faith, i.e., based upon such impermissible considerations as race, religion, or the desire to prevent his exercise of constitutional rights." *Penagaricano–Soler*, 911 F.2d at 837. If the government has a sufficient countervailing reason, it can rebut an indication of discriminatory treatment. *Id.*, at 838.

■ " 'Discriminatory purpose' ... implies more than ... intent as awareness of consequences. It implies that the decisionmaker ... selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *Wayte*, 470 U.S. at 610, 105 S.Ct. at 1531, *quoting Personnel Administrator of Mass. v. Feeney*, 442 U.S. 256, 279, 99 S.Ct. 2282, 2295, 60 L.Ed.2d 870 (1979). Goldberg claims that the decision to prosecute him was made because of his "First Amendment activities." Thus, there are two inquiries involved in this issue: (1) whether the defendant makes a colorable claim that a fundamental right (in this case, his First Amendment right to petition the government) has been the reason for the alleged discriminatory governmental action, and (2), if so whether the prosecution had the requisite "discriminatory purpose."

For a defendant to prove that the government's prosecution of him has been invidious or in bad faith, he must show that the prosecution was intended to interfere with the exercise of a constitutional right. *United States v. Penagaricano–Soler*, 911 F.2d 833, 837 (1st Cir.1990), *quoting United States v. Union Nacional de Trabajadores*, 576 F.2d 388, 395 (1st Cir.1978). Goldberg contends that in his case, the constitutional right was his First Amendment right to petition the government for redress of grievances. Specifically, he claims that the activities he undertook to resist the taking of his property are protected by the First Amendment and do not fall within the preview of the mail fraud, wire fraud, conspiracy, and other statutes under which he is prosecuted. He argues, in effect, that the court should extend

the *Noerr–Pennington* doctrine to cover what the government claims are his illegal actions in this case.

The *Noerr–Pennington* doctrine is an antitrust doctrine. It stems from two cases, *United Mine Workers v. Pennington*, 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965) and *Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961), in which the Supreme Court held that application of the Sherman Act is not appropriate in situations in which companies are exercising their First Amendment rights. As another judge in this district has summarized the doctrine, it stands for the proposition that "bona fide efforts to obtain or influence legislative, executive, judicial or administrative actions are immune from antitrust liability." *Action Ambulance Serv., Inc. v. Atlanticare Health Serv.s, Inc.*, 815 F.Supp. 33, 40 (D.Mass.1993), *quoting Clipper Exxpress v. Rocky Mountain Motor Tariff Bureau, Inc.*, 690 F.2d 1240, 1251 (9th Cir.1982).

■ Goldberg suggests that the *Noerr–Pennington* doctrine is regularly applied in cases outside the antitrust context. The doctrine does not, however, immunize activities said to violate the criminal laws of the United States. Indeed, the First Circuit has twice refused to extend the *Noerr–Pennington* doctrine to situations where criminal, not antitrust, laws have been violated. *Welch v. United States*, 750 F.2d 1101 (1st Cir.1985) (failure to pay income taxes is not "protected speech" under *Noerr–Pennington*); *United States v. Marcano–Garcia*, 622 F.2d 12 (1st Cir.1980) (refusing to extend *Noerr–Pennington* to kidnapping). The District of Columbia Circuit has also refused to extend the doctrine to the arena of the criminal law. *Whelan v. Abell*, 48 F.3d 1247 (D.C.Cir.1995) (right to petition government does not include right to file false claims). Furthermore, as the Supreme Court has stated, "one could imagine situations where the most effective means of influencing government officials is bribery, and we have never suggested that that kind of attempt to influence the government merits protection." *Allied Tube & Conduit Co. v. Indian Head, Inc.*, 486 U.S. 492, 504, 108 S.Ct. 1931, 1939, 100 L.Ed.2d 497 (1988). The court finds this precedent not only persuasive, but dispositive, and refuses to extend the *Noerr–Pennington* doctrine to the activity in which Goldberg is said to have engaged.

■ Even indulging Goldberg's version of the facts, however, the court finds no discriminatory intent, under the *Feeney* standard, for Goldberg's prosecution. Under the *Feeney* standard, as noted above, the defendant must show that the government pursued its allegedly-discriminatory "course of action" " 'because of' ... its adverse effects" on the defendant. *Wayte*, 470 U.S. at 610, 105 S.Ct. at 1531, *quoting Personnel Administrator of Mass. v. Feeney*, 442 U.S. 256, 279, 99 S.Ct. 2282, 2295, 60 L.Ed.2d 870 (1979). Unlike the defendants in *Penagaricano–Soler* and *Bassford* (both of whom, the court notes, were unsuccessful in their attempts to dismiss their indictments), Goldberg alleges no disparity between his treatment and that of the other potential defendants that is not countered with a rational explanation by the government. Goldberg claims he is the only one of the alleged conspirators being prosecuted. But, as noted above, the government responds (1) that Goldberg, unlike the other alleged conspirators, did not waive the statute of limitations as to the offenses alleged against him and (2) that the investigation is ongoing as to others, and those others may yet be prosecuted.

Because he cannot show the requisite "discriminatory intent" behind his prosecution, Goldberg's claim must fail under this prong of the test for selective prosecution, as well.

### III. Request for an Evidentiary Hearing

■ One final matter bears addressing briefly—although its resolution is presaged by the foregoing discussion. Goldberg requests an evidentiary hearing on the issues underlying his selective prosecution claim. To merit an evidentiary hearing, a defendant must allege " 'some facts (a) tending to show that he has been selectively prosecuted and (b) raising a reasonable doubt about the propriety of the prosecution's purpose.' If the prosecutor presents 'countervailing reasons' to justify the prosecution, the district court

may refuse to grant an evidentiary hearing." *United States v. Bassford,* 812 F.2d 16, 19 (1st Cir.1987), *cert. denied* 481 U.S. 1022, 107 S.Ct. 1909, 95 L.Ed.2d 514, *citing United States v. Saade,* 652 F.2d 1126, 1135 (1st Cir.1981).

The First Circuit found, in the cases mentioned above (*Penagaricano–Soler, Bassford,* and *Saade* ) that those defendants had not alleged sufficient facts to merit evidentiary hearings. Their cases were all stronger than Goldberg's. Furthermore, as noted, the government here has presented countervailing reasons for the prosecution. The defendant's request for an evidentiary hearing is therefore DENIED.

For the foregoing reasons, the defendant's motion, in all parts, is DENIED.

SO ORDERED.